527 So.2d 194 (1988)
Judias V. BUENOANO a/K/a Judy Ann Goodyear, Appellant,
v.
STATE of Florida, Appellee.
No. 68091.
Supreme Court of Florida.
June 23, 1988.
*195 James A. Johnston, Pensacola, for appellant.
Robert A. Butterworth, Atty. Gen. and Margene A. Roper, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
Judias V. Buenoano appeals her conviction for first degree murder and sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm both the conviction and sentence.
On August 31, 1984, Buenoano was indicted for first degree murder for the September 16, 1971 death by suspected arsenic poisoning of her husband, Sergeant James E. Goodyear. Evidence at trial revealed that, shortly after Sergeant Goodyear returned to Orlando from a tour of duty in South Vietnam, he began suffering from nausea, vomiting and diarrhea. When hospitalized at the naval hospital in Orlando on September 13, 1971, Goodyear reported to Dr. R.C. Auchenbach that he had been ill with these symptoms for two weeks. When Dr. Auchenbach could find no explanation for these symptoms, he attempted to *196 stabilize Goodyear's condition but these attempts failed. Goodyear suffered fluid overload and pulmonary congestion and died as a consequence of cardiovascular collapse and renal failure.
No toxicological assay was performed at the time of Goodyear's death because there was no reason to suspect toxic poisoning. However, Dr. Auchenbach testified that, had he known in 1971 arsenic was present in Goodyear's body, his medical opinion would be that Goodyear could have died as a result of acute arsenic toxication because circulatory collapse and the other symptoms Goodyear exhibited are manifestations of acute arsenic poisoning.
Forensic toxicologist Dr. Lenard Bednarczyk analyzed tissue samples from the exhumed body of Goodyear. He testified that the level of arsenic found in the liver, kidneys, hair and nails of Goodyear indicated chronic exposure to arsenic poison. The opinion of Dr. Bednarczyk and Dr. Thomas Hegert, the Orange County medical examiner who autopsied Goodyear's remains in 1984, was that Goodyear's death was the result of chronic arsenic poisoning occurring over a period of time.
In addition to the medical evidence regarding Goodyear's condition, Debra Sims, who lived with Buenoano and Goodyear shortly before Goodyear's death, testified that Goodyear became sick gradually and that she witnessed him having hallucinations about a rabbit on his bed as he picked at the bed linens. She also testified that Buenoano hesitated to take Goodyear to the hospital when he became ill. Two of Buenoano's acquaintances, Constance Lang and Mary Beverly Owens, both testified that Buenoano discussed with each of them on separate occasions the subject of killing a person by adding arsenic to his food. Owens and Lodell Morris each testified that Buenoano admitted she killed Goodyear.
Evidence was also presented at trial that Bobby Joe Morris, with whom Buenoano lived after Goodyear's death, became ill and died after exhibiting the same symptoms of vomiting, nausea, fever and hallucinating that Goodyear exhibited before his death. When Morris' remains were exhumed in 1984, the tissue analysis revealed acute arsenic poisoning.
After Morris' death Buenoano and John Gentry began living together and later became engaged. Gentry testified at trial that Buenoano told him Goodyear died in a plane crash in Vietnam and Morris died of alcoholism. In November of 1982, Gentry caught a cold, and Buenoano began giving him the vitamin C capsule Vicon C to treat it. Because he was experiencing extreme nausea and vomiting, Gentry checked into a hospital on December 15, 1982. After a full recovery he returned home, and on that same day Buenoano gave him Vicon C capsules again. The nausea and vomiting returned. Gentry had the capsules chemically analyzed, and the capsules were found to contain paraformaldehyde, a class III poison. Testimony at trial was that Buenoano had been telling her associates Gentry was suffering from terminal cancer.
Following Goodyear's death in 1971, Buenoano collected the benefits from various life insurance policies on her husband's life totalling approximately $33,000. She also received $62,000 in dependency indemnity compensation from the Veterans Administration. When Bobby Joe Morris died, Buenoano again received insurance money from three separate policies on Morris' life totalling approximately $23,000. The house mortgage was also paid off. Buenoano owned life insurance on Gentry's life totalling $510,000 in benefits, and she was a 50% beneficiary under his will.
At trial the jury found Buenoano guilty of first degree murder for the death of James Goodyear and recommended imposition of the death penalty. The trial court found four aggravating circumstances and no mitigating factors and sentenced Buenoano to death.
Buenoano raises six points on appeal. Buenoano first claims it was error for the trial court to admit collateral crimes evidence regarding the arsenic poisoning of Bobby Joe Morris and the attempted poisoning of John Gentry in violation of the Williams rule. Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 *197 S.Ct. 102, 4 L.Ed.2d 86 (1959). Buenoano contends that the collateral crimes evidence was admitted only to show bad character and criminal propensity of the accused.
Under the Williams rule evidence of other crimes, wrongs and acts is admissible if it is relevant to and probative of a material issue even though the evidence may indicate the accused has committed other uncharged crimes or may otherwise reflect adversely upon the accused's character. Section 90.404(2)(a), Florida Statutes, (1983), codifies the ruling in Williams v. State and lists the purposes for which such evidence is deemed to be admissible: proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Because of the potential for prejudice to the defendant's case, evidence of collateral crimes will not be admitted solely on the basis of mere similarity between the crime charged and the collateral crimes. For collateral crimes to be admissible there must be something so unique or particularly unusual about the perpetrator or his modus operandi that introduction of the collateral crimes evidence would tend to establish that he committed the crime charged. Chandler v. State, 442 So.2d 171 (Fla. 1983).
In the case at bar we find poisoning to be a particularly unusual modus operandi to warrant the introduction of the collateral crimes evidence. When compared, the details of each offense are strikingly similar. All three victims established a close relationship with Buenoano either as her husband, common-law husband or fiance. While living with her, each victim became seriously ill, requiring hospitalization upon displaying similar symptoms. A poison was used in all three cases. Buenoano was the beneficiary under a number of life insurance policies issued on the lives of the three victims and was also entitled to other monetary benefits upon the victims' deaths. These details are not merely evidence of a general similarity between the charged offense and the collateral crimes. "These points of similarity `pervade the compared factual situations' and when taken as a whole are `so unusual as to point to the defendant.'" Kight v. State, 512 So.2d 922, 928 (Fla. 1987) (quoting Drake v. State, 400 So.2d 1217, 1219 (Fla. 1981)). Under these facts the collateral crimes evidence was admissible to prove motive, opportunity, identity, intent, and absence of mistake, and to show a common plan or scheme.
Second, Buenoano contends that the state did not prove the corpus delecti in the instant case independent of Buenoano's confessions[1] and the collateral crimes evidence and, thus the trial court improperly denied the motion for directed verdict of acquittal. The corpus delecti in a homicide case consists of: (1) the fact of death; (2) the existence of the criminal agency of another; and 3) the identity of the deceased. Bassett v. State, 449 So.2d 803 (Fla. 1984). The state must establish that the specific crime charged has actually been committed. However, the state is not required to prove the corpus delecti beyond a reasonable doubt before a confession or evidence of collateral crimes is admitted. Circumstantial evidence is all that is required to establish a preliminary showing of the necessary elements of the crime. State v. Allen, 335 So.2d 823 (Fla. 1976).
In the instant case Dr. Auchenbach testified at trial to the fact of James Goodyear's death. A certified copy of the death certificate was admitted into evidence, and the defense stipulated that the remains in the casket were those of Goodyear. Numerous medical experts testified that in their medical opinion the concentrations of arsenic found in Goodyear's organs and hair were high enough to determine Goodyear's death was caused by chronic arsenic toxication. Expert medical testimony as to the cause of death need not be stated with reasonable certainty in a homicide prosecution and is competent if the expert can show that, in his opinion, the occurrence *198 could cause death or that the occurrence might have or probably did cause death. Delap v. State, 440 So.2d 1242 (Fla. 1983) cert. denied, 467 U.S. 1264, 104 S.Ct. 3559, 82 L.Ed.2d 860 (1984).
Additionally, Constance Lang testified that Buenoano discussed her unhappiness with her marriage to Goodyear both before and after his tour of duty in Vietnam. Debra Sims testified that Goodyear appeared healthy upon his return from Vietnam, but his health began to deteriorate shortly thereafter. She further testified that, when Goodyear began to hallucinate, Buenoano refused to take him to the hospital right away. Upon Goodyear's death Buenoano collected the insurance proceeds from the life insurance policies on his life.
We find that the state brought forth substantial circumstantial evidence to meet its burden of establishing a prima facie case of homicide independent of the confession and collateral crimes evidence. Buenoano's confessions and the collateral crimes evidence were not admitted for the purpose of proving the corpus delecti, and the trial court properly denied the motion for directed verdict of acquittal.
Buenoano's third point on appeal questions whether the trial court improperly denied her motion for mistrial based on the gratuitous comment made by Mary Beverly Owens that Buenoano set fire to her own house to collect insurance proceeds. Buenoano contends this remark was irrelevant and constituted an attack on her character. Although we agree the remark was improper, given the totality of the circumstances we do not find the remark was so prejudicial as to require a mistrial. When the comment was made the trial judge sustained defense counsel's objection, but no motion for mistrial was made. Later when defense counsel moved for a mistrial, the trial judge denied the motion but agreed to give a curative instruction to the jury if so requested. Defense counsel subsequently requested the instruction whereupon the trial judge instructed the jury to disregard the statement made by Ms. Owens. A mistrial should be declared only when the error is so prejudicial and fundamental that it denies the accused a fair trial. Even if the comment is objectionable, the proper procedure is to request a curative instruction from the trial judge that the jury disregard the remark. See Ferguson v. State, 417 So.2d 631 (Fla. 1982). The curative instruction was sufficient in this case to dissipate any prejudicial effect of the objectionable comment. From our evaluation of the record Buenoano received a fair trial, and the trial judge did not abuse his discretion in denying her motion for mistrial.
After reviewing Buenoano's claims we conclude there is substantial, competent evidence to support the conviction. We find no reversible error in the guilt phase of Buenoano's trial and, therefore, affirm her conviction for first degree murder.
Buenoano's fourth point on appeal concerns her sentencing proceeding. She claims it was error for the trial court to allow the testimony of the attorney who prosecuted her in Santa Rosa County, Florida for the first-degree murder of her son because the details of the testimony were inaccurate and amounted to hearsay.[2] Section 921.141(1), Florida Statutes (1984), provides in part that all legally obtained probative evidence, including hearsay, is admissible during the penalty phase provided the defendant has a fair opportunity to rebut any hearsay statements. Testimony concerning the events which resulted in the conviction is admissible so the judge and jury can take into consideration the character of the defendant when determining whether the death penalty is called for in his or her particular case. Elledge v. State, 346 So.2d 998 (Fla. 1977). Examination of the record in this case reveals the testimony at the sentencing proceeding was admissible and susceptible to fair rebuttal, especially since defense counsel also represented Buenoano in the prior felony cases. Furthermore, Buenoano's allegation *199 that the prosecutor's testimony detailing her prior felony conviction was inaccurate is mere speculation. This Court has no way of comparing the testimony given by witnesses at the Santa Rosa trial to that given by the prosecutor in the case at bar since the Santa Rosa record was not made part of the record on appeal. Testimony during the sentencing proceeding relating to Buenoano's prior conviction was extraneous and not critical to the finding of aggravation because there was a certified judgment and sentence evidencing the conviction. Although the testimony may have amounted to the type of "overkill" which this Court has repeatedly met with disapproval, in the context of the entire trial any error which may have occurred in admitting this particular testimony was harmless and did not result in prejudice to the defendant's case requiring a new sentencing proceeding.
Next, Buenoano challenges two of the four aggravating circumstances found by the trial court. She argues that it was error for the trial court to find the murder was committed for pecuniary gain. We find the evidence was sufficient to support the trial court's finding. Constance Lang testified that Buenoano never discussed the possibility of ending her marriage by divorce, but only mentioned using poison to solve her marital problems. The evidence showed that as a result of Goodyear's death, Buenoano became entitled to and received life insurance proceeds and veteran's benefits. Had Buenoano chosen to end her marriage by divorce, she would not have been entitled to any of this money. Additionally, Mary Beverly Owens testified that Buenoano advised her not to divorce her husband, but rather told her to take out additional life insurance on his life and then poison him. Further, Buenoano admitted to both Owens and Lodell Morris that she killed Goodyear. Thus it was not error for the trial court to apply this aggravating factor.
Finally, we reject Buenoano's assertion that the arsenic poisoning of James Goodyear was not heinous, atrocious or cruel. The trial court based its finding of aggravation on the fact that Goodyear's death was not swift and painless, but was the result of Buenoano slowly and methodically poisoning him. Under the standard set forth in State v. Dixon, 283 So.2d 1, 9 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), a homicide is especially heinous, atrocious or cruel when "the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim." Systematically poisoning one's husband over a period of time until it causes his death and witnessing the effects of the poison is an unusual manner and method of committing a homicide. This is clearly a conscienceless, pitiless crime, especially since Goodyear's death did not occur as a result of a single effort, but by virtue of continued efforts on the part of Buenoano. His death was not instantaneous, and the medical descriptions reveal he suffered considerable pain and torture.
We find that the record also supports the trial court's conclusions regarding the two remaining aggravating circumstances. We agree with the trial court, and Buenoano does not dispute, that the murder was committed in a cold, calculated and premeditated manner. We also agree, and Buenoano does not dispute, that the murder was committed by a person previously convicted of a felony involving the use or threat of violence. We find that the trial court properly found four aggravating circumstances and no mitigating factors.
From our review of the record we conclude that the imposition of the death penalty by the trial court was correct. For the reasons expressed, we affirm both the defendant's conviction and sentence of death.
It is so ordered.
McDONALD, C.J., and OVERTON, EHRLICH, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] The reference to Buenoano's confessions concerns statements made by Buenoano to Lodell Morris and Mary Beverly Owens that she killed Goodyear which were admitted as part of the testimony of these two witnesses.
[2] Although Buenoano also alleges it was error to allow the testimony of the attorney who prosecuted her in Escambia County for the attempted murder of John Gentry, this argument was not developed in her brief, and therefore we do not address it.