Judy A. **BUENOANO**, Petitioner–
Appellant,

v.

Harry K. **SINGLETARY**, Respondent–
Appellee.

No. 90–3525.

United States Court of Appeals,
Eleventh Circuit.

Jan. 25, 1996.

Billy H. Nolas, Julie D. Naylor, Philadelphia, PA, for Appellant.

Margene A. Roper, Asst. Attorney General, Dept. of Legal Affairs, Daytona Beach, FL, for Appellee.

Before TJOFLAT, Chief Judge, and KRAVITCH and COX, Circuit Judges.

PER CURIAM:

Judy A. Buenoano was convicted in Orange County, Florida of first degree murder and sentenced to death for killing her husband, James E. Goodyear. This appeal is from the district court's denial of relief on her first 28 U.S.C. § 2254 petition for a writ of habeas corpus. In a prior opinion, we vacated in part the district court's denial of relief and remanded the case for a limited evidentiary hearing, retaining jurisdiction over the appeal. *Buenoano v. Singletary*, 963 F.2d 1433, 1434 (11th Cir.1992). Following the evidentiary hearing, the district court again denied relief, and Buenoano appeals. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

In June of 1971, James E. Goodyear, Buenoano's husband, returned to Orlando, Florida from a tour of duty in South Vietnam. Soon thereafter, he began experiencing weakness, nausea, vomiting, and diarrhea. Goodyear was hospitalized. He reported to Dr. R.C. Auchenbach, his attending physician, that he had been suffering from these symptoms for two weeks. Dr. Auchenbach was unable to determine the cause of Goodyear's condition, which continued to deteriorate. Despite Dr. Auchenbach's efforts to stabilize Goodyear's condition, Goodyear died on September 16, 1971. The predominant causes of death were cardiovascular collapse and renal failure.

Toxicological assays were not performed at the time of Goodyear's death because there was no reason to suspect toxic poisoning. In 1984, however, Goodyear's body was exhumed and an autopsy was performed. A forensic toxicologist analyzed tissue samples from the exhumed body and concluded that the level of arsenic found in Goodyear's liver, kidneys, hair, and nails indicated that Goodyear died from chronic and acute arsenic exposure. In August of 1984, Buenoano was indicted for Goodyear's murder.

At trial, Dr. Thomas Hegert, the medical examiner who performed the autopsy on Goodyear's exhumed body in 1984, opined that Goodyear's death resulted from chronic arsenic exposure. Dr. Auchenbach further testified that the symptoms which Goodyear exhibited were consistent with acute arsenic poisoning and that Goodyear could have died from acute arsenic intoxication.

In addition to the medical evidence concerning the cause of Goodyear's death, the state presented the testimony of Debra Sims, who lived with Buenoano and Goodyear shortly before Goodyear's death. Sims testified that Goodyear grew ill following his return from Vietnam and that she witnessed him hallucinating. Furthermore, Sims testified that Buenoano hesitated to take Goodyear to the hospital when he became ill.

Two of Buenoano's acquaintances, Constance Lang and Mary Beverly Owens, testified that Buenoano discussed with each of them on separate occasions the subject of killing a person by adding arsenic to his food. Lang testified that Buenoano had joked on several occasions about lacing her husband's food with arsenic. Owens testified that after hearing an upsetting phone call between Owens and her husband, Buenoano suggested that Owens take out more life insurance on her husband and then poison him with arsenic. Following Goodyear's death, Buenoano collected $33,000 in life insurance proceeds and $62,000 in indemnity compensation from the Veterans Administration. Owens and another acquaintance, Lodell Morris, both testi-

fied that Buenoano admitted killing Goodyear.

The evidence at trial also indicated that Buenoano had committed acts similar to Goodyear's poisoning. After Goodyear's death, Buenoano lived with Bobby Joe Morris, who became ill and died after exhibiting the same symptoms that Goodyear had exhibited. When Morris's remains were exhumed in 1984, the tissue analysis revealed acute arsenic poisoning. Buenoano collected approximately $23,000 in life insurance proceeds following Morris's death.

After Morris died, Buenoano lived with John Gentry. In November of 1982, Gentry contracted a cold, and Buenoano began giving him the vitamin C capsule Vicon C to treat it. Gentry began to suffer from convulsions, nausea, and vomiting. He checked into a hospital and soon recovered. Upon returning home, Buenoano gave Gentry Vicon C again, and the nausea and vomiting returned. Gentry then had the capsules analyzed; the analysis revealed that the capsules contained paraformaldehyde, a class III poison. Buenoano held a $510,000 life insurance policy on Gentry.

A jury found Buenoano guilty of the first degree murder of Goodyear. During the penalty phase of the trial, the state presented further evidence against Buenoano. Gentry testified that after he refused to take the Vicon C which he had discovered to be poisoned, Buenoano was responsible for having his car bombed. Buenoano had been convicted of attempted murder for her role in the car bombing. (R. 3–13 at 56.) The jury also was told that Buenoano had been convicted of murder in the drowning death of her disabled son, Michael. Buenoano collected life insurance proceeds following Michael's death.

The jury recommended a sentence of death by a vote of ten to two. The trial judge found four aggravating circumstances: (1) Buenoano had been convicted previously of a capital felony or of a felony involving the use or threat of violence to the person; (2) the murder was committed for pecuniary gain; (3) the murder was especially heinous, atrocious, and cruel; and (4) the murder was committed in a cold, calculated, and premeditated manner. *See* Fla.Stat.Ann. § 921.141(5) (West 1985). The court found no mitigating circumstances and sentenced Buenoano to death.

The Supreme Court of Florida upheld Buenoano's conviction and sentence on direct appeal, *Buenoano v. State,* 527 So.2d 194 (Fla.1988), upheld the denial of postconviction relief, and denied her petition for a writ of habeas corpus. *Buenoano v. Dugger,* 559 So.2d 1116 (Fla.1990). Buenoano filed a second motion for postconviction relief in state court, which was denied by the trial court. Addressing the merits of the second motion for postconviction relief, the Supreme Court of Florida affirmed the trial court's decision denying Buenoano relief. *Buenoano v. State,* 565 So.2d 309 (Fla.1990).

Buenoano then filed this, her first 28 U.S.C. § 2254 petition in federal court.[1] The district court held a limited evidentiary hearing and denied relief. Buenoano appealed to this court, asserting that the district court failed to afford her a full and fair evidentiary hearing on certain claims and erred in denying relief on other claims. In our previous opinion, we concluded that Buenoano was entitled to a further evidentiary hearing on two of her claims: claim (2), which asserts that she was denied effective assistance of counsel at the penalty phase of the trial; and claim (3), which asserts that she was denied effective assistance of counsel at trial and on direct appeal because her attorneys had a conflict of interest. *Buenoano v. Singletary,* 963 F.2d at 1436. We vacated the denial of relief on these two claims and remanded the case to the district court for an evidentiary hearing. *Id.* We retained jurisdiction over the appeal in order to address all issues

---

1. Buenoano's habeas petition contains 21 claims and is 275 pages long. It reads as if it is both a petition and a brief. Many of the claims in the petition are characterized by conclusory references to reported decisions. This practice, which has become common, is not contemplated either by the habeas rules or the civil rules and makes it difficult for courts to identify discrete claims in a petition. We expressly disapprove of this practice. *See Kennedy v. Herring,* 54 F.3d 678, 681–82 n. 1 (11th Cir.1995).

following disposition of the matters remanded to the district court. *Id.* at 1440.

The district court then held an extensive evidentiary hearing on the two claims remanded. The court addressed in detail Buenoano's claim that she was denied effective assistance of counsel at the penalty phase of her trial. Buenoano contends that she was denied the effective assistance of counsel at the sentencing phase of her trial due to her attorneys' failure to investigate, discover, and present mitigating evidence concerning her background and mental health. The district court found that Buenoano's attorney, James A. Johnston, did not investigate Buenoano's mental health because he had known her for a long time and she did not exhibit any indication of mental disturbance. Nothing in her medical records indicated that she had mental problems until after the penalty phase was concluded and she had been sentenced to death. Johnston also indicated that because Buenoano continued to maintain her innocence, he felt that presenting evidence of mental problems at the penalty phase might suggest to the jury a reason for committing the crime, which was inconsistent with their defense strategy.

The district court found that Johnston's strategy was reasonable and planned. The court also found that, even if mental health evidence had existed and been presented, it would not have outweighed the aggravating factors. Therefore, Buenoano had not demonstrated that Johnston's strategy prejudiced her.

The second issue addressed at the evidentiary hearing was Buenoano's attorneys' alleged conflict of interest. The evidence indicates that on November 25, 1985, Buenoano entered into a contract with Rebecca Johnston and James A. Johnston, her lawyers at trial, sentencing, and on direct appeal. The contract assigned to the lawyers Buenoano's rights, royalties, profits, and any form of consideration up to $250,000 derived from books, movies, publications, or media events relating to Buenoano's criminal charges. The contract also gave the Johnstons the right to accept, reject, and negotiate on Buenoano's behalf offers and contracts regarding these rights. (Supp. R. 4–112 at 2.) The contract was not presented to Buenoano and entered into until after all the evidence was presented during the penalty phase of the trial.[2] (*Id.* at 14.)

The district court found that Buenoano's counsel had a potential conflict of interest but that Buenoano had presented no evidence of an actual conflict. In addition, the court found that even if an actual conflict existed, the Johnstons' representation of Buenoano was not adversely affected by the conflict. Therefore, the court found the conflict of interest claim to be without merit.

The district court thus denied Buenoano relief on both claims. On appeal, Buenoano contends that the district court erred in denying her relief on these two claims. In addition, Buenoano reasserts the other issues presented on her initial appeal.

## II. ISSUES

In our prior opinion, we vacated the denial of relief on Buenoano's claims of ineffective assistance of counsel at the penalty phase of her trial and of a conflict of interest and remanded them for an evidentiary hearing. We retained jurisdiction over those claims that we did not remand and stated that we would address them following remand. We now conclude that the claims that were not remanded to the district court are without merit and do not warrant further discussion.[3]

2. Mr. Johnston testified that the purpose of the contract was to provide him with the possibility of compensation for his extensive representation of Buenoano in a number of different cases, for which he had been paid a fraction of the value of his services. (Supp. R.4–112 at 4.)

3. *See* 11th Cir.R. 36–1. These claims are: (1) that she was denied her Fifth, Sixth, Eighth, and Fourteenth Amendment rights due to the trial court's failure to instruct the jury on the lesser included offense of premeditated murder and by her counsel's and the court's failure to give her a choice between waiving the expired statute of limitations and having the benefit of the lesser included offense instructions or asserting the statute of limitations on the lesser included offenses; (2) that the 1973 version of Florida's death penalty statute, Fla.Stat.Ann. 775.082, was unconstitutionally applied to this case where the offense of conviction occurred in 1971; (3) that her right to a reliable capital sentencing proceeding was violated by the state's introduction of

We now address only the two claims that we previously remanded to the district court. The first issue is whether the district court erred in denying relief on Buenoano's claim that she received ineffective assistance of counsel at the penalty phase of her capital trial. The second issue is whether the court erred in denying relief on her claim that she was denied effective assistance of counsel at both phases of her trial and on direct appeal because her counsel had a conflict of interest arising from a book and movie rights contract concerning her case.

## III. STANDARDS OF REVIEW

■ Both ineffective assistance of counsel and conflict of interest claims present mixed questions of law and fact. *United States v. Camacho*, 40 F.3d 349, 353 (11th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1810, 131 L.Ed.2d 735 (1995); *Oliver v. Wainwright*, 782 F.2d 1521, 1524 (11th Cir.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986). In reviewing these claims, we defer to the district court's findings of fact unless we determine that the findings are clearly erroneous. We apply our own judgment, however, as to whether the conduct in question constitutes ineffective assistance of counsel or an actual conflict of interest warranting relief. *Camacho*, 40 F.3d at 353; *Oliver*, 782 F.2d at 1524.

## IV. DISCUSSION

### A. Ineffective Assistance of Counsel at Sentencing

Buenoano contends that the Johnstons failed to provide her with effective assistance of counsel at sentencing because they failed to adequately investigate and present certain mitigating evidence. In particular, Buenoano contends that the Johnstons did not reasonably investigate Buenoano's background and mental health. She alleges that the Johnstons knew that she had been in various foster homes as a child, that she had been given various names, that her mother had died at an early age, that her father had been injured fighting in a war and had not cared for her, and that she had not had stability in her life. Moreover, she argues that the Johnstons knew that she had falsely held herself out to be a clinical doctor and sociologist, and that she had been admonished for impersonating a doctor by a clinic at which she worked. According to Buenoano, the Johnstons also knew that she had made various bizarre statements and behaved strangely at work and had a history of seizures. Despite having this information, she argues, her attorneys did not undertake a reasonable investigation into her life and her mental health and, thus, there was no informed tactic to forego the presentation of such evidence at the penalty phase of the trial.

Defense counsel's strategy at the penalty phase was to emphasize Buenoano's humanity, potential, and her low probability of future dangerousness. The defense also emphasized the residual doubt in the case by exposing conflicts in the circumstantial evidence. Buenoano argues that she was prejudiced by this unreasonable strategy because there is a reasonable probability that the outcome of the penalty phase would have been different had the Johnstons investigated and presented evidence regarding other mitigating factors. Buenoano suggests that the Johnstons could have presented evidence of physical, sexual, and emotional abuse. Evidence of mental illness, she argues, could also have been presented.

■ To examine a claim of ineffective assistance of counsel, we apply the two prong test set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). For a defendant to prevail under the *Strickland* test, the "defendant must prove that (1) counsel's performance was deficient, falling below an objective standard of reasonableness; and (2) the deficient performance

victim impact information and unrebuttable hearsay testimony; (4) that her appellate counsel failed to render effective assistance by his failure to urge a claim of error under *Richardson v. State*, 246 So.2d 771 (Fla.1971), because the state called a surprise expert witness which prejudiced her defense; and (5) that the trial court's penalty phase instructions and the prosecutor's argument unconstitutionally shifted the burden to Buenoano to prove that death was not appropriate, and that the trial court unduly limited full consideration of mitigating circumstances to those which outweighed aggravating circumstances. *Buenoano*, 963 F.2d at 1435–36.

prejudiced the defense." *Camacho,* 40 F.3d at 355. The district court found that the Johnstons' performance at the penalty phase of the trial was reasonable and that Buenoano was not prejudiced by their alleged failure to investigate and present certain mitigating evidence. We conclude that Buenoano was not prejudiced, and thus do not address the reasonableness of the Johnstons' performance.

■ In examining whether a defendant in a death penalty case was prejudiced by the failure to present mitigating evidence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. at 2067. We analyze this issue, therefore, by examining the mitigating evidence that Buenoano asserts would have compelled a different result and considering that evidence against the aggravating factors presented at the penalty phase.

Buenoano contends that at the time of her husband's murder, she was under extreme emotional disturbance and unable to conform her behavior to the essential requirements of the law, and that counsel failed to present such mitigating evidence. At the evidentiary hearing held after remand, two experts testified that Buenoano had such mental problems. The state, however, presented an expert who contradicted Buenoano's contention, testifying that there was no evidence or past records indicating that Buenoano suffered from an organic personality disorder or bipolar disorder as Buenoano's experts had testified. (Supp.R. 4–112 at 82.) The state's expert opined that Buenoano had developed a generalized anxiety disorder after sentencing, which is normal and often seen in prisoners on death row.

The district court concluded that providing testimony at the penalty phase of the trial that Buenoano was mentally ill at the time of the crime could leave the jury with the impression that Buenoano admitted committing the crime and was seeking sympathy or excuse because of her background or mental state. This was inconsistent with trial counsel's strategy. The court also found that the use of such mitigating evidence would have limited value because mental health experts could be found to testify both that Buenoano was and was not mentally ill, and that many of the conclusions of experts testifying that Buenoano was mentally ill were based upon background information fabricated by her since the penalty phase hearing. There is support in the record for these factual findings. The court concluded that the ultimate success of this approach in obtaining a life sentence was unlikely. (*Id.* at 83.)

At the evidentiary hearing, Buenoano also testified that the Johnstons failed to present mitigating evidence regarding her childhood. She said that her childhood was characterized by economic hardship and was filled with mental, physical, and sexual abuse by a number of persons as she was bounced among relatives and numerous foster homes. The district court found that Buenoano's testimony concerning this history was internally conflicting, conflicted with prior statements she had made, and untruthful. (*Id.* at 95–96.)

Several of Buenoano's family members filed affidavits and were deposed. They testified that Buenoano had been physically and sexually abused. The district court found that none of the relatives who testified had personal knowledge of any physical or sexual abuse of Buenoano. The court found that their testimony of such abuse and of Buenoano's foster home placement was based on rumor, innuendo, hearsay, and on statements allegedly made by Buenoano herself to others who were not witnesses before the court. The court found that their testimony was sometimes contradictory. The court found that at no time had Buenoano told the Johnstons of the emotional, sexual, and physical abuse that she now contends is part of her background, although they had questioned her about her background. Furthermore, the court found that Buenoano herself originated the present allegation that she was

physically and sexually abused and had an impoverished background.

These factual findings are not clearly erroneous; they find support in the record. It is difficult to discern exactly what evidence of mental, physical, or sexual abuse can be said to have been reasonably available to defense counsel given the district court's factual findings. We assume, however, as the district court apparently did, that some evidence of this kind could have been presented.

Because of credibility problems attending this evidence, the court found that the evidence would not have been well received by the jury. Moreover, the testimony would have been readily defused on cross-examination in the penalty phase proceedings as it was by the state in the evidentiary hearing before the district court. Therefore, the district court concluded, the presentation of such potentially mitigating evidence would not have produced a different result.

To determine whether the Johnstons' failure to present this mitigating evidence prejudiced Buenoano, we must weigh the mitigating evidence against the aggravating factors that were presented at the penalty phase proceedings. The trial judge found four aggravating circumstances: (1) Buenoano had been convicted previously of a capital felony or of a felony involving the use or threat of violence to the person; (2) the murder was committed for pecuniary gain; (3) the murder was especially heinous, atrocious, and cruel; and (4) the murder was committed in a cold, calculated and premeditated manner. The evidence at both the guilt and penalty phase of the trial indicated that Buenoano killed Goodyear by poisoning him with arsenic, causing him to experience weakness, nausea, vomiting, and diarrhea for several months before he died. In addition, the trial evidence indicated that Buenoano killed Goodyear in order to collect life insurance proceeds and compensation from the Veterans Administration. The evidence also indicated that Buenoano had killed a live-in boy-friend by poisoning him with arsenic and collected life insurance after his death. Buenoano also attempted to murder John Gentry by poisoning him with paraformaldehyde and by causing a bomb to be placed in his car. Moreover, Buenoano had been convicted of murdering her disabled son, Michael, and she collected life insurance proceeds upon his death as well.

■ In light of the gravity of the aggravating factors presented at the penalty phase and the relative unpersuasiveness of the mitigating evidence that Buenoano alleges the Johnstons should have presented, we agree with the district court that the presentation of this evidence would not have resulted in a life sentence. We conclude that there is no reasonable probability that the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Therefore, we find that Buenoano was not prejudiced by the Johnstons' failure to present this evidence at the penalty phase of the trial, and thus conclude that counsel was not ineffective at sentencing.

### B. Conflict of Interest

On November 25, 1985, Buenoano signed a contract with the Johnstons that assigned to the Johnstons the rights, royalties, profits, and any form of consideration up to $250,000 derived from books, movies, publications or media events relating to Buenoano's criminal charges. (Supp. R.4–112 at 2.) The contract was initially discussed and executed after all the evidence had been presented in the penalty phase of Buenoano's trial. (*Id.* at 17.) Buenoano asserts, however, that she had discussed the publication rights contract many times before she signed the contract with the Johnstons.[4] Buenoano contends that this contract created an actual conflict of interest for the Johnstons because it caused them to make a choice between alternative courses of action. She claims that the Johnstons' trial strategy was affected by the contract because the Johnstons had an interest in the publication rights of her story. In particular,

4. Buenoano also alleges that initially she refused to sign the contract, but that Mr. Johnston coerced her into signing it after her initial refusal. However, Mr. Johnston testified that the contract was Buenoano's idea, and that she signed it willingly. The district court found that Mr. Johnston's testimony was more credible than Buenoano's and concluded that Buenoano freely entered into the contract.

Buenoano argues that the Johnstons "waived ... Buenoano's right to lesser included offenses [and] they chose to try the case on an 'all or nothing' basis—an acquittal, as opposed to a conviction on lessers, [which] plainly would have made for a more lucrative book or movie." (Appellant's Post–Remand Brief at 54.) She also argues that at the penalty phase of the trial, "they developed no mental health or background mitigation when a 'possible alternative course of action' would have been to develop and present such evidence [and] this surely was not beneficial to ... Buenoano." (*Id.*)

Mr. Johnston had represented Buenoano in a number of different criminal and civil matters, and Buenoano was unable to pay Mr. Johnston for the complete value of his services. Mr. Johnston testified that Buenoano had come up with the idea of paying him from the proceeds of her story in order to compensate him for his legal services. Mr. Johnston testified that he had presented the contract to Buenoano after all of the work in the case had basically been done and after all the evidence had been presented at the penalty phase. He testified that Buenoano signed the contract willingly, and that thereafter he did absolutely nothing with respect to the agreement. He did not discuss or advise Buenoano on her publication rights or take any steps to obtain or promote publications or the sale of publication rights. Furthermore, he never received any money as a result of the contract. Mr. Johnston testified that the contract did not affect in any way his performance in representing Buenoano. (Supp. R.4–112 at 9.) The district court credited his testimony.

 The right to effective assistance of counsel encompasses the right to representation free from actual conflict with defense counsel. *Lightbourne v. Dugger,* 829 F.2d

1012, 1022 (11th Cir.1987), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). "In order to establish an effective assistance of counsel claim arising from an alleged conflict of interest, a defendant 'must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* at 1023 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980)).[5] Thus, in conflict of interest cases, we first determine whether an actual conflict existed, and then we determine whether the actual conflict had an adverse effect on counsel's representation.

 In assessing whether a conflict existed, we must be convinced that the conflict is actual, not merely hypothetical or speculative. *McConico v. Alabama,* 919 F.2d 1543, 1546 (11th Cir.1990). A mere possibility of conflict of interest does not rise to the level of a Sixth Amendment violation. *Smith v. White,* 815 F.2d 1401, 1404 (11th Cir.), *cert. denied,* 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987).[6] In assessing whether an actual conflict adversely affected counsel's representation, "[a] petitioner need not show that the result of the trial would have been different without the conflict of interest, only that the conflict had some adverse effect on counsel's performance." *McConico,* 919 F.2d at 1548.

 We conclude, as did the district court, that Buenoano has failed to show any adverse effect on counsels' performance. Thus, the conflict, even if actual, did not rise to a Sixth Amendment violation. The district court found that much of Buenoano's testimony regarding the contract was unworthy of belief. The court found that the contract was initially discussed and executed after all the evidence had been presented in the penalty phase of the trial. Thus, the contract was not discussed until after the Johnstons

---

**5.** *But see Hamilton v. Ford,* 969 F.2d 1006, 1011 (11th Cir.1992) (declining to extend the *Cuyler* standard to joint representation cases in which a timely objection was made at trial), *cert. denied,* 507 U.S. 1000, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993).

**6.** This circuit has adopted the following test to distinguish between actual and potential conflict: "We will not find an actual conflict unless [the defendant] can point to specific instances in the record to suggest an actual conflict or im-

pairment of [her interest]." *Smith,* 815 F.2d at 1404 (quoting *Barham v. United States,* 724 F.2d 1529, 1532 (11th Cir.), *cert. denied,* 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984)). The defendant "must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence" that favors an interest in competition with that of the defendant. *Id.* "If [the attorney] did not make such a choice, the conflict remained hypothetical." *Id.*

had devised their penalty phase strategy. The contract played absolutely no role in counsels' guilt or penalty phase strategy. Moreover, Buenoano offers no evidence of an adverse effect on counsels' appellate performance. Therefore, we find that the Johnstons' performance was not adversely affected by any conflict even if an actual conflict existed. Accordingly, we find that counsels' performance was not ineffective due to a conflict of interest.

## V. CONCLUSION

We affirm the district court's denial of relief.

AFFIRMED.