BENTON, J.
Michelle Alford Wesson was convicted of child neglect causing great bodily harm, in violation of section 827.03(3)(b), Florida Statutes (2001), a second-degree felony. On direct appeal, she contends that the trial court erred in denying her motion for judgment of acquittal at the close of the State’s case-in-chief, a motion she renewed at the close of all the evidence. We agree and reverse.
I.
The State’s theory was that Ms. Wesson’s unhygienic housekeeping caused the death of her son, whose immune system she knew was genetically defective. In response to the defense’s motion for judgment of acquittal, the State argued that “by choosing not to make her house clean and safe [Ms. Wesson] either failed willfully or by culpable negligence failed or omitted to provide him with the care, supervision and services necessary for his physical health,” so causing his death.[1] That Jimmy Alford, the son who died, had a chromosomal abnormality making him “immune-compromised,” and that his mother was aware of this, seem not to have been in dispute. Also apparently genetically caused was a marked developmental delay: fourteen when he died, Jimmy had the mental ability of a three-year-old child. Given his sudden demise, the State did not specifically allege or seek to prove any failure to obtain, or delay in seeking, necessary medical care.[2] Defense witnesses testified to frequent doctors’ visits, regular administration of several medicines, and that Ms. Wesson gave Jimmy conscientious personal care.
We must decide de novo whether the evidence of causation or result was legally sufficient to go to the jury. We conclude it was not, either at the close of the State’s case-in-chief, or at the close of all the evidence. “[A]n order on a motion for a judgment of acquittal is reviewed by the de novo standard.” Jones v. State, 790 So.2d 1194, 1196 (Fla. 1st DCA 2001). While the “courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the [State] can be sustained under the law,” Lynch v. State, 293 So.2d 44, 45 (Fla.1974); see Darling v. State, 808 So.2d 145, 155 (Fla.2002); Beasley v. State, 774 So.2d 649, 657 (Fla.2000); State v. Brockman, 827 So.2d 299, 303 (Fla. 1st DCA 2002), it “is axiomatic that the state has *384 the burden of proving each of the various elements of the offense,[3] and that it must, in order to avoid the entry of a judgment of acquittal, produce legally sufficient evidence of each element.” Penton v. State, 548 So.2d 273, 274 (Fla. 1st DCA 1989).
II.
Jimmy died in his sleep in the early morning hours of November 11, 2001, of septicemia or “blood poisoning,” a blood-borne infection that spread to several internal organs. According to Dr. Michael Berkland, who performed the autopsy, bacteria entered the body from an unknown outside source, either through the nose, through the mouth (possibly by ingestion), or through one of the open sores on Jimmy’s skin. Dr. Berkland testified that septicemia starts as bacteremia, ie., with bacteria entering the blood stream traveling throughout the body. Then, with florid, bacterial “overgrowth,” endotoxins the bacteria produce reach critical levels, causing blood pressure to drop precipitously. Septicemia (which is defined by the onset of symptoms) begins when sickness manifests itself, and progresses rapidly.
“[Tjaking the evidence in a light most favorable to the State,” Watkins v. State, 826 So.2d 471, 474 (Fla. 1st DCA 2002), the jury could have found that Ms. Wesson and her children lived in a truly filthy house. Jimmy died on a dirty mattress on the floor of his mother’s house on Hard Times Lane, in a town called Holt, in northern Okaloosa County. The day before, Ms. Wesson’s father, who had begun plumbing repairs, instructed her not to flush the only toilet in the house, until he could finish the work. One result was that soiled toilet paper was placed in a small trash can which eventually (perhaps posthumously) overturned. A soiled piece of paper ended up near the corpse. Pet droppings were also present in the house.
Ms. Wesson’s shortcomings as a housekeeper were nothing new, the jury could also have found. Over a period of years, employees of the Department of Children and Family Services (DCFS) warned her that the house needed to be cleaned or her children would be taken from her. They visited her many times, sometimes describing the condition of her house as “hazardous.” Once in 1996 DCFS did remove the children for a short time. On that occasion, as on the other visits before November 11, 2001, Jimmy and the other children were in good health, as far as the DCFS investigators could tell. (After his death, DCFS took custody of Jimmy’s siblings.)
Neither Dr. Berkland, at the time Oka-loosa County’s medical examiner, nor anybody else[4] did any testing to ascertain what type of bacteria caused the septice *385 mia that led to Jimmy’s death. As the State conceded at oral argument, no expert testified it was more likely that the lethal organisms came from Jimmy’s home,[5] rather than from somewhere else.[6] The only other physician the State called testified that the oysters Jimmy ate the day before he died were a more likely source of the fatal bacteria than his mother’s dirty house.
III.
After the medical testimony, the State rested and the defense moved for a directed verdict, arguing these grounds:
To convict this young lady they need to prove that a dirty house killed [Jimmy] and that she was culpably negligent in the situation ... and we have had testimony, not from the defense, but from *386 the prosecutor that these oysters could have killed this boy and I don’t think there’s enough evidence in there to go to the jury as to her killing him with a dirty house.
[[Image here]]
I don’t think they’ve got enough evidence in there on that if you look at the statute itself.... They haven’t given enough — she had a dirty house, filthy house. We will concede that. That didn’t bring his death about and that’s what they’ll have to prove is that it was the cause of his death and there’s been no doctor in here at all that has testified to that. The best doctor [for the prosecution] was [Dr. Berkland], which he tried the hardest to get over to the court and do what he could, but he didn’t go that far,[7] Your Honor, and I feel that it would be a waste of time for us to go to a jury and that the Judge should direct a verdict of acquittal in this case.
For reasons that are not clear from the record, the learned trial judge denied the motion for judgment of acquittal.
This is not a case in which causation was of a kind that is a matter of common knowledge or understanding. An autopsy was ordered to determine the cause of Jimmy’s death, for good reason. Expert opinion testimony was necessary for the jury to find, beyond a reasonable doubt, that Ms. Wesson’s admitted failings as a housekeeper caused her son’s death. The State needed to put expert testimony before the jury to prove why, after years of living in his mother’s house, in the conditions that regrettably prevailed there, Jimmy could not be awakened on the morning of November 11, 2001.
In order to be admissible, “[expert medical testimony as to the cause of death need not be stated with reasonable [medical] certainty ... and is competent if the expert can show that, in his opinion, the occurrence could cause death or that the occurrence might have or probably did cause death.” Buenoano v. State, 527 So.2d 194, 197-98 (Fla.1988); see also Eversley v. State, 748 So.2d 963, 968 (Fla.1999); Delap v. State, 440 So.2d 1242, 1253 (Fla.1983). But proof beyond a reasonable doubt is necessary to convict. In order to support a conviction, therefore, while “medical testimony as to the likelihood or probability of a causal connection between the defendant’s act and the victim’s death is generally sufficient to establish causation,” “expert testimony as to the mere possibility of causal relation between the act and death is generally insufficient.” Penton, 548 So.2d at 274. It was insufficient in the present case.
The State did not put on a prima facie case that Ms. Wesson’s housekeeping or anything at or about her house caused Jimmy’s illness or death. In adducing evidence from which the jury could logically conclude no more than that Jimmy died of an infection which he might have contracted in any of a number of different places, *387 the State failed to meet its burden of proof on causation. The State proved the “mere possibility” that Ms. Wesson’s house (as opposed, inter alia, to a relative’s house, or to the schoolhouse, or to the school bus, or to a water fountain) was the source of the germs that led to the bacteremia and then to the septicemia that caused Jimmy’s death. After all, although one of the State’s experts ruled oysters out as a cause of death, another State’s expert testified that the oysters were a more likely cause of death than the house was.
Reversed.
LEWIS and THOMAS, JJ., Concur.

. The State similarly argued in closing that
[Ms. Wesson] made that choice over and over again to allow [Jimmy] to live like that. He compromised his immune system. It was obviously hazardous to his health and he finally lost the battle. She was warned, counseled, threatened to go a different way but she chose to have utter disregard for the safety of her child.

. In addition to proof of poor hygiene, the State put on evidence concerning rotten food and some of the electrical wiring in the house.
The information broadly alleged that
on or between January 1, 1997 and November 11, 2001, at and in Okaloosa County, Florida, [Michelle Wesson] did unlawfully and willfully or by culpable negligence neglect a child, to-wit: James Alford, a person under the age of eighteen (18) years, to-wit: fourteen (14) years of age, and in so doing caused great bodily harm, permanent disability, or permanent disfigurement to said child, in violation of Sections 827.03(3)(a) and 827.03(3)(b), Florida Statutes.
See § 827.03(3)(b), Fla. Stat. (2001) ("A person who willfully or by culpable negligence neglects a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the second degree.”).

. The jury was instructed that the following elements had to be established beyond a reasonable doubt:
1. MICHELLE ALFORD WESSON willfully or by culpable negligence failed or omitted to provide JAMES L. ALFORD with the care, supervision, and services necessary to maintain JAMES L. ALFORD's physical or mental health!.]
2. In so doing, MICHELLE ALFORD WESSON caused great bodily harm ... to JAMES L. ALFORD.
3. MICHELLE ALFORD WESSON was a caregiver for JAMES L. ALFORD.
4. JAMES L. ALFORD was under the age of eighteen years.
Neglect of a child may be based on repeated conduct or on a single incident or omission that resulted in, or reasonably could have been expected to result in, serious physical or mental injury, or a substantial risk of death, to a child.
(Emphasis supplied.) See Fla. Std. Jury Instr. (Crim.) § 16.5, at 44 (4th ed. Supp. 2004).

.The rate of decomposition and Dr. Berk-land's handling of the specimens made it impossible for the other experts to conduct a meaningful evaluation. The defense expert agreed with the State’s experts that the source *385 of Jimmy’s septicemia could not be determined, on the available evidence.

. The following exchange occurred at oral argument on February 17, 2005:
Judge Lewis: Is there any expert testimony of record that the source of the bacteria that killed the child came from the home? Assistant Attorney General Kruse: They didn’t type the source of the bacteria, they didn't type what specific bacteria killed the child because it would have been, would have been useless....
Judge Benton: Therefore, the answer to Judge Lewis’s question is no?
Assistant Attorney General Kruse: Right, right.

. Jimmy and his mother spent the evening of the day before he died at the home of Geraldine Alford, who was once married to Ms. Wesson’s father. Jimmy ate four to six raw oysters there. That evening, he complained of a stomachache. The night before that Jimmy and the other children spent with Travis McLean, Jimmy’s uncle, at still another house. To all appearances healthy, Jimmy had been going to school, riding the school bus, and spending time at Ms. Wesson's father's home (where Ms. Wesson and the children were bathing and cooking while waiting for their plumbing to be fixed).
As was "made clear, in Walker v. State, 604 So.2d 475, 476-77 (Fla.1992), ... the only evidence to be looked to on review of the denial of a motion for judgment of acquittal [statjed at the close of the State’s case is evidence adduced before the State rested.” Williams v. State, 711 So.2d 41, 42 (Fla. 1st DCA 1998). But the experts the State called were aware that Jimmy had not been confined to his mother’s house in the hours and days before his death, and the motion for judgment of acquittal was renewed after the close of all the evidence.
The only so-called "similar case” Dr. Berk-land was aware of was shown to be dissimilar in a crucial respect:
Q Okay.... Now, have you ... ever had somebody who — a case similar to where somebody died from being exposed to like a filthy house or anything like that?
A Yes, I have.
Q And, again, it’s the same pathology or whatever that you've talked about?
A Yes, sir.
Q And how long ago was that?
A That was probably about 1995.
Q Okay. Anything about that that was similar to this case?
A This was a smaller child. This was not a person that was up mobilizing on their own. So their opportunity to pick up bacteria and stuff was strictly limited to what they were able to acquire either feeding from the bottle[,] feeding from the breast or picking up in their crib.
Q Okay. And they died from septicemia, some type of bacteria overgrowth?
A Correct....
In other words, the “smaller child” in the other case never left the confines of its home. Dr. Berkland also testified that
[a]n immune compromised person is already at risk just from every day normal ... living conditions, is the normal exposure to bacteria and stuff, just shaking somebody's hand and then rubbing your nose, drinking from a water fountain or whatever. There’s always the risk of picking up organisms like that,
and that
just talking on a telephone, just putting that moist mouth piece up to your moist mouth is all it takes for somebody who’s got an impaired immune system. The next thing you know that person has a pharyngitis or has a sore throat and they’ve got it from talking on the telephone.

. While Dr. Berkland testified that bacteria are present in dirty houses, he also testified that bacteria are present virtually everywhere, and that immune-compromised people can contract infections from water fountains or telephones. Not only did his testimony establish no more than a possibility that the dirty house caused Jimmy’s infection, it also failed to establish that Ms. Wesson’s house "could reasonably be expected to result in serious physical or mental injury,” or “substantial risk of death." See Weeks v. State, 832 So.2d 954, 955-56 (Fla. 2d DCA 2002) (holding trial court should have granted appellant's motion for judgment of acquittal where no medical expert testified that the condition of the child’s teeth "could reasonably be expected” to result in serious injury, as section 827.03(3)(a), Florida Statutes, requires, only that it could "potentially” result in serious injury).