575 So.2d 170 (1991)
Bernell HEGWOOD, Appellant,
v.
STATE of Florida, Appellee.
No. 72336.
Supreme Court of Florida.
January 17, 1991.
Rehearing Denied March 15, 1991.
H. Dohn Williams, Jr. of H. Dohn Williams, Jr., P.A., Special Public Defender, Fort Lauderdale, for appellant.
Robert A. Butterworth, Atty. Gen. and Carolyn M. Snurkowski, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Bernell Hegwood appeals his convictions of first-degree murder and sentences of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the convictions, but vacate the death sentences and remand for imposition of life imprisonment with no possibility of parole for twenty-five years.
On May 23, 1987 Fort Lauderdale police officers found the manager and two employees of a Wendy's shot dead inside the restaurant. Three days later Annie Broadway, another Wendy's employee, told police that Hegwood, her son who also worked at Wendy's, had admitted committing the murders and robbery to her. Police arrested Hegwood in Louisiana and returned him to Florida. Evidence produced by the state included Hegwood's several confessions to the police, his mother, girlfriend, and brother; the fact that Hegwood had a considerable and unexpected amount of cash following the robbery, some of which he used to buy clothing and jewelry for himself and his girlfriend; and shoe prints found at the Wendy's that matched the shoes worn by Hegwood when arrested even though he had not been at work for two days and the restaurant floors were scrubbed every *171 night. A jury convicted Hegwood of armed robbery and three counts of first-degree murder. The trial court overrode the recommendations of life imprisonment and imposed three death sentences.
Hegwood's trial began in late January 1988, and the defense rested its case on the afternoon of Friday, February 5. That night a woman named Nellie Burgess called the Fort Lauderdale Police Department and told a detective, in a taped telephonic interview, that she had driven by the Wendy's where the killings occurred early in the morning of the day of the crimes and that two armed black men had run across the street in front of her car. She could not positively identify Hegwood as one of those men. On Sunday morning (February 7) Burgess went to Fort Lauderdale where another detective interviewed her in person. At that time she positively identified Hegwood from a photographic lineup as one of the two men she had seen.
Before court proceedings began the next morning, the police informed the prosecutor and defense counsel that Burgess had come forward and identified Hegwood. The state then presented rebuttal witnesses, and closing arguments began. During those arguments, both sides received copies of the transcription of the Sunday interview with Burgess. The following day, during jury deliberations, defense counsel moved for a mistrial, claiming that Burgess' statement constituted Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), material which the state had not disclosed in a timely manner. Counsel also asked for a Richardson[1] hearing on this alleged discovery violation. The trial judge stated that he wanted to talk with the detectives, but, before the hearing could be held, the jury returned its verdicts.
After accepting the verdicts and excusing the jury, the court held a Richardson hearing at which the two detectives testified. In argument following that testimony defense counsel claimed surprise because the second detective's verbal statement on Monday did not match the transcript exactly. The prosecutor stated that he would have used Burgess' testimony except for her having waited nine months to come forward and because of discrepancies between her statement and testimony received at trial.[2] The court found no discovery violation and denied the motion for mistrial.[3]
Burgess testified for the defense at the penalty proceeding and stated that Hegwood was not one of the men she saw run across the street. Following trial, but prior to sentencing, Hegwood filed a motion for new trial, judgment of acquittal after verdict, and arrest of judgment after verdict based on Burgess' testimony, claiming her testimony constituted newly discovered evidence. The court denied the motion.
In challenging his convictions Hegwood claims that the state violated Brady by both withholding and misleading him about exculpatory evidence and that the court erred in not granting a mistrial or a new trial based on the Brady violation or because of newly discovered evidence. After examining this record, we disagree.
Brady holds that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. The United States Supreme Court later qualified *172 this holding, "to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). Additionally, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." Id. at 109-10, 96 S.Ct. at 2400-01. Therefore,
[t]o establish a Brady violation a defendant must prove the following: (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.
United States v. Meros, 866 F.2d 1304, 1308 (11th Cir.), cert. denied, ___ U.S. ___, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989) (citations omitted). Hegwood's claim does not meet this test.
The state disclosed in a timely manner Burgess' existence and her positive identification of Hegwood. Not telling counsel of Burgess' inability to identify him positively in the first interview conducted over the telephone does not amount to suppression of favorable evidence in light of her positive identification during the second interview. See James v. State, 453 So.2d 786 (Fla.), cert. denied, 469 U.S. 1098, 105 S.Ct. 608, 83 L.Ed.2d 717 (1984). The state need not actively assist the defense in investigating a case. Hansbrough v. State, 509 So.2d 1081 (Fla. 1987). Because her second interview produced evidence favorable to the state, not to Hegwood, and because the prosecutor decided not to call her as a witness, the state had no duty to do more.[4]
We, like the trial court, find no Brady violation. The state did not know that Burgess' testimony would be favorable to Hegwood, Hegwood had equal access to her testimony, the prosecution did not suppress favorable evidence, and, due to the discrepancies between Burgess' testimony and the evidence produced at trial, including Hegwood's confessions, there is no reasonable probability that the outcome would have been different. See Waterhouse v. State, 522 So.2d 341 (Fla.), cert. denied, 488 U.S. 846, 109 S.Ct. 123, 102 L.Ed.2d 97 (1988). Moreover, for much the same reasons, we find no abuse of the trial court's discretion in the denial of the motion for new trial based on the characterization of Burgess' testimony as newly discovered evidence.[5]See Freeman v. State, 547 So.2d 125 (Fla. 1989). Finding no merit to Hegwood's challenge to his convictions and finding the record contains competent substantial evidence to support them, we hereby affirm his convictions of three counts of first-degree murder.
Turning to the sentences, however, we agree with Hegwood that the trial court should not have overridden the jury's recommendation *173 of life imprisonment.[6] As this Court has stated before: "In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). We do not find that the Tedder test has been met in this case. Besides knowing that Hegwood was seventeen years old when he committed the instant crimes, the jury heard testimony from family members and other people about Hegwood's being a generally good and obedient child who had an unfortunate and impoverished childhood. A great part of Hegwood's ill-fated life appears to be attributable to his mother, described by witnesses as a hard-drinking, lying drug addict and convicted felon who tended to abandon her children and who turned Hegwood in and testified against him, apparently motivated by the reward money offered in this case. Based on the mental health expert's testimony the jury may have believed that Hegwood was mentally or emotionally deficient because of his upbringing. On this record we cannot agree that "virtually no reasonable person could differ," id., as to death being the proper sentence here.
Therefore, we affirm Hegwood's convictions, but vacate his sentences and remand to the trial court for imposition of life imprisonment with no possibility of parole for twenty-five years.[7]
It is so ordered.
OVERTON, McDONALD, BARKETT and KOGAN, JJ., concur.
EHRLICH, Senior Justice, concurs in part and dissents in part with an opinion, in which SHAW, C.J. and GRIMES, J., concur.
EHRLICH, Senior Justice, concurring in part and dissenting in part.
I concur with the Court's affirmation of the defendant's conviction of three counts of first-degree murder but I dissent from the Court's setting aside the imposition of the death penalty for each of the three homicides for which the defendant stands convicted.
The jury, on an evenly divided vote, returned an advisory sentence recommending life imprisonment for each of the three homicides. The trial judge overrode this recommendation, concluding that the numerous aggravating factors found[8] were not outweighed by the single statutory mitigating factor of age.[9]
The majority has concluded, on the basis of Tedder v. State, 322 So.2d 908 (Fla. 1975), that the trial judge erred in overriding the jury's recommendation of life imprisonment. The principle enunciated in Tedder, that "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ," id. at 910, has been interpreted by this Court to mean that when there is a reasonable basis in the record to support a jury's recommendation of life, an override is improper. In other words, when there are valid mitigating factors discernible from the record upon which the jury *174 could have based its recommendation, an override may not be warranted. Ferry v. State, 507 So.2d 1373 (Fla. 1987). In my opinion, the Tedder standard has clearly been met in this case.
Contrary to the Court's opinion, I find nothing in the testimony of defendant's mental health expert that would lend support to the majority's assertion that based on this testimony "the jury may have believed that Hegwood was mentally or emotionally deficient because of his upbringing." Slip op. at 8. Dr. Caddy, a clinical psychologist, testified that defendant was competent at the time of the commission of the crime and at the time of trial. The doctor said that he, the doctor, was:
confused with respect to a whole lot of the dynamics that exist between he [sic] and his mother, and the brother that lives or has lived with he [sic] and his mother. That confusion is really a product feeling that this man has, in essence, played a game with me.... The game he was playing was, in essence, the assertion that one, he didn't commit the crime, but seeing as I was bright and seeing as the police had the resources, surely they could work out who did do the crime.
The doctor, however, was of the opinion that the defendant "is not morally impaired from a psychological point of view."
The doctor was impressed by the support that defendant received from his aunts and his father, and it was his view, because of the quality of these affections, that "the relationship with the mother did not produce more overall psychological disturbances."[10] The most that the doctor could say was that defendant did have a personality disorder growing out of his relationship with his mother, but that he did not "perceive this young man to be all that profoundly impaired in this area." There is absolutely nothing in this testimony that would support a jury recommendation of life.
We do not have a factual situation comparable to that which supported the life recommendation in Ferry where there was expert testimony that the defendant suffered from "paranoid schizophrenia," and "the evidence overwhelmingly showed that Ferry suffer[ed] from an extreme mental illness," 507 So.2d at 1376, and where the trial judge "correctly recognized this [mental illness] in his sentencing order by finding as mitigating factors that Ferry was under the influence of extreme mental or emotional disturbance (section 921.141(6)(b)) and that Ferry's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired (section 921.141(6)(f))." Ferry, 507 So.2d at 1376.
This case is likewise factually distinguishable from Morris v. State, 557 So.2d 27 (Fla. 1990), where the jury recommendation of life was approved. In Morris, there was but one aggravating factor (the killing was committed in a particularly heinous, atrocious, or cruel manner) and the defendant was "borderline retarded with an I.Q. of approximately seventy-five." Id. at 30. All parties agreed that when Morris testified "his mental limitations were obvious," id., and "[e]xcept for the victim's relatives, *175 virtually everyone who was familiar with the defendant and his acts (the jury, the presentence investigation officer, the chief police investigator, teachers, and coaches) recommended against the death penalty." Id.
Again, the facts here do not measure up to those in Amazon v. State, 487 So.2d 8 (Fla.), cert. denied, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986), where the jury's recommendation of life was also upheld. In that case, the trial judge found four aggravating circumstances. Although no mitigating factors were found by the trial court, this Court concluded that "the jury could have properly found and weighed mitigating factors and reached a valid recommendation of life imprisonment." 487 So.2d at 13. A review of the record revealed that:
[T]here was sufficient evidence for the jury to have found that Amazon acted under extreme mental or emotional disturbance... . There was some inconclusive evidence that Amazon had taken drugs the night of the murders, stronger evidence that Amazon had a history of drug abuse, and testimony from a psychologist indicated Amazon was an "emotional cripple" who had been brought up in a negative family setting and had the emotional maturity of a thirteen-year-old with some emotional development at the level of a one-year-old.
Id.
The mitigating evidence in this case is insignificant when compared to that in Cochran v. State, 547 So.2d 928 (Fla. 1989).[11] In that case, there was expert testimony that "due to a long-standing mental deficiency (I.Q. of 70), Cochran was likely to become emotionally disturbed under stress and substantially impaired in his ability to conform his conduct to the law," 547 So.2d at 932, as well as testimony of Cochran's former teachers that "he had a history of crippling emotional problems and a severe learning disability" which "severely limited his ability to progress in school or hold even the simplest job." Id.
While I have long ago learned that it is futile to endeavor to fathom or divine why a jury reached a particular verdict, it seems to me that most likely this jury was swayed by the testimony of witness Burgess, and the doubt this testimony may have cast on the verdicts of guilt which was a major thrust of defense counsel's closing argument at sentencing. However, this Court has consistently held that lingering doubt cannot be the basis of a jury recommendation. See, e.g., White v. Dugger, 523 So.2d 140 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 184, 102 L.Ed.2d 153 (1988); King v. State, 514 So.2d 354, 358 (Fla. 1987), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988). Consequently, that evidence cannot serve as a basis for the jury recommendation in this case.
I also think it likely that the negative testimony concerning defendant's mother may very well have struck a responsive note in the hearts of the jurors. While the entire trial, particularly the penalty phase, was replete with negative testimony about defendant's mother and her deficiencies as a mother and as a person, such cannot be a basis for a life recommendation. The evidence at the penalty phase is supposed to focus on the defendant's character, not the character or shortcomings of another person. In short, evidence designed to show Hegwood's mother to be a bad or undesirable person cannot support a jury recommendation of life. Likewise, while there may very well have been a conflict between defendant and his mother, evidence of that conflict, without more, cannot serve as a reasoned basis for the jury's recommendation.
There was also evidence that defendant had not caused problems while incarcerated. However, while rehabilitation is a positive attribute which can be a basis for a jury's life recommendation, see McCampbell v. State, 421 So.2d 1072 (Fla. 1982), *176 there was no evidence to show Hegwood's potential for rehabilitation.
Based on this record, I find no reasonable basis for the jury's recommendation. The aggravating circumstances in this case are overwhelming. This was no garden-variety robbery that went awry. Two of the murders were apparently committed execution fashion. Because I find the facts in this case so clear and convincing that no reasonable person could differ that death is the appropriate penalty, I would affirm the trial judge's imposition of that penalty for each of the three homicides for which Hegwood stands convicted.
SHAW, C.J., and GRIMES, J., concur.
NOTES
[1] Richardson v. State, 246 So.2d 771 (Fla. 1971).
[2] Burgess said she first passed the Wendy's no later than 7:15 to 7:30 a.m. A Wendy's employee, however, testified that she called in sick at 8:00 a.m. and spoke to one of the victims. Burgess said it was a beautiful, clear morning. Other witnesses testified that it rained all morning. Burgess said she again passed the Wendy's about 10:00 a.m. and saw police around it. The police, however, did not arrive until after noon.
[3] The following day, February 10, to complete the record, the court stated that "there has been no discovery violation. There has been shown no prejudice to the defendant. The defendant was supplied all the information at the same time the state was prior to the conclusion of the case."
[4] The fact that the state, not Hegwood, was surprised by Burgess' testimony is illustrated by defense counsel's comments during argument on the motion filed just prior to sentencing:

So at that point I think Mr. Satz [prosecutor] was probably a little bit surprised to see that she made an identification of somebody other than my client as being outside the Wendy's maybe a half hour before the murders were committed with the gun. Two individuals that were not my client.
I was not quite as surprised as Mr. Satz because I had her look through the window in your courtroom and look at my client before I put her on the stand. She had said that does not look like the individual or one of the individuals or any of the individuals that I saw outside the Wendy's.
[5] Fla.R.Crim.P. 3.600 provides, in pertinent part:

(a) The court shall grant a new trial if any of the following grounds is established:
* * * * * *
(3) That new and material evidence, that if introduced at the trial would probably have changed the verdict or finding of the court, and that the defendant could not with reasonable diligence have discovered and produced upon the trial, has been discovered.
[6] Because of this ruling we do not address the other points raised regarding sentencing.
[7] At the trial court's discretion these sentences may be consecutive or concurrent. State v. Enmund, 476 So.2d 165 (Fla. 1985).
[8] The trial court found the following aggravating factors: (1) that at the time of the crime for which the defendant was to be sentenced, he had been previously convicted of another capital offense, (2) that the crime for which the defendant was to be sentenced was committed while the defendant was engaged in the commission of a robbery, (3) that the crime for which the defendant was to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest, (4) that the crime was committed for pecuniary gain (but not applicable in the light of finding number 1 above), (5) that the crime was especially heinous, atrocious, or cruel, and (6) that the homicides were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
[9] The trial judge found the statutory mitigating factor of age at the time of the offense but did not find any nonstatutory mitigating circumstance.
[10] In the penalty phase, two cousins and two aunts testified, in essence, that they loved the defendant and that he was a good boy who cared for his younger brothers and looked after them, that defendant never complained about being poor, that defendant's mother was frequently drunk and on drugs and on the whole did not look after defendant and his siblings. His stepmother testified that defendant stayed with his father and her in Michigan for four to four and one-half years when he was about 11 years of age. According to her, defendant seemed to have a normal childhood while he was with them. She said that about a year earlier, defendant contacted her and wanted to continue to go to school in Michigan. She and his father brought him to Michigan; however, within a couple of weeks, defendant's mother started contacting him, wanting him to return to Louisiana with his two brothers, promising to be a better mother, and defendant did in fact return to Louisiana.

Defendant's mother testified that defendant was a good boy and that when she went to prison, the children lived with their father. When she served her time, she said that the children wanted to come home and she sent them tickets.
Defendant's father testified that he loved his son and doubted that he committed the crimes in question.
[11] In Cochran, this Court reversed the trial court's override of the jury's life recommendation despite the fact that four days prior to the homicide for which he was convicted, he had killed another person for which he had been convicted of first-degree murder, which fact was known to the sentencing judge but not to the jury which recommended life.