708 So.2d 941 (1998)
Judy A. BUENOANO, Appellant,
v.
STATE of Florida, Appellee.
No. 92522.
Supreme Court of Florida.
March 26, 1998.
*943 Gregory C. Smith, Capital Collateral Counsel, and Sylvia W. Smith and Robert Friedman, Assistant Capital Collateral Counsel, Office of the Capital Collateral Counsel, Northern Region, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General, and Candance M. Sabella and Katherine V. Blanco, Assistant Attorneys General, Tampa, for Appellee.
PER CURIAM.
Judy A. Buenoano, a prisoner under sentence of death and a third death warrant, appeals an order denying her motion for postconviction relief and her request for a stay of execution. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
This is Buenoano's third round of postconviction motions in state court. See Buenoano v. State, 559 So.2d 1116 (Fla.1990) (affirming trial court's summary denial of first rule 3.850 motion and denying petition for writ of habeas corpus after death warrant signed); Buenoano v. State, 565 So.2d 309 (Fla.1990)(affirming denial of second rule 3.850 motion after death warrant signed). Buenoano also has sought and ultimately was denied relief in federal court. See Buenoano v. Singletary, 74 F.3d 1078 (11th Cir.), cert. denied, ___ U.S. ___, 117 S.Ct. 520, 136 L.Ed.2d 408 (1996).
In order to put Buenoano's various claims in perspective, we find it necessary to summarize the evidence presented at trial and explain much of the procedural background leading up to the rule 3.850 motion at issue here.

FACTS
Buenoano is facing execution for the first-degree murder of her husband, James Goodyear. According to testimony presented during the Orange County trial, Goodyear died in 1971, as a result of chronic arsenic poisoning. The cause of death was discovered in 1984, after Goodyear's body was exhumed. Two of Buenoano's acquaintances testified that Buenoano had discussed with them killing a person by arsenic poisoning. One of the those acquaintances and another witness testified that Buenoano admitted killing Goodyear.
Additionally, during the guilt phase of the trial the State introduced Williams[1] rule evidence regarding the death of Bobby Joe Morris and the poisoning of John Gentry. According to testimony at trial, Morris, with whom Buenoano lived after Goodyear's death, also died of acute arsenic poisoning. Gentry, with whom Buenoano lived after Morris's death, testified that he suspected Buenoano was trying to poison him with vitamin capsules, known as Vicon C, which Buenoano was giving him to combat a cold. *944 Gentry ultimately turned several of the capsules over to the police.
After Gentry testified in the guilt phase of the trial, a stipulation reached by the State and defense counsel was read to the jury. The stipulation traced the path of the Vicon C capsules from the police to the Federal Bureau of Investigation's (FBI) crime laboratory in Washington, D.C., where the capsules were examined by Special Agent Roger Martz, a lab chemist. As to Martz's examination of the capsules, the jury was told that Martz determined the capsules were Vicon C capsules and that they contained paraformaldehyde, a Class III poison. After the stipulation was read to the jury, Dr. Thomas Hegert testified that the symptoms displayed by Gentry, as indicated in Gentry's medical records, could be consistent with being caused by paraformaldehyde. Buenoano later testified, during her case in chief, that she was familiar with paraformaldehyde and was aware that it would take a lot more than one capsule containing 1½ grams of the substance to cause death. On cross-examination, when asked if she gave John Gentry paraformaldehyde, Buenoano responded, "I did not. If I did, it was an accident." Evidence also was presented during the guilt phase of the trial that Buenoano either collected benefits from or was the beneficiary of various life insurance policies on the three men with whom she had lived.
Much of Buenoano's motion for postconviction relief centers around newly obtained evidence concerning Special Agent Roger Martz. Although Martz's stipulated conclusions were introduced in the Orange County trial where Buenoano was convicted of first-degree murder and sentenced to death, Martz did not testify before that jury. Martz testified in the prior Escambia County trial for the attempted first-degree murder of John Gentry by bombing. That testimony formed the basis for the stipulation of Martz's conclusions concerning the contents of the Vicon C capsules which was read to the Orange County jury during the guilt phase of the trial.
Evidence of Buenoano's Escambia County attempted murder conviction was not introduced during the guilt phase of the Orange County first-degree murder trial. Guilt phase evidence concerning Gentry was limited to Williams rule evidence about Buenoano's alleged attempts to poison him. Evidence of Buenoano's Escambia County attempted first-degree murder conviction, together with evidence of her Santa Rosa County conviction for the first-degree drowning murder of her son, was introduced during the sentencing phase to support the prior violent felony aggravator.
The jury found Buenoano guilty of first-degree murder and by a vote of ten to two recommended imposition of the death penalty. The trial court followed the jury's recommendation, finding no mitigating factors and four aggravating factors: (1) Buenoano had been convicted previously of a capital felony or a felony involving the use or threat of violence to the person; (2) the murder was committed for pecuniary gain; (3) the murder was especially heinous, atrocious, and cruel; and (4) the murder was committed in a cold, calculated, and premeditated manner. This Court upheld Buenoano's conviction and sentence. See Buenoano v. State, 527 So.2d 194 (Fla.1988).

PROCEDURAL BACKGROUND
In January 1997, Capital Collateral Regional Counsel for the Northern Region (CCRC), on behalf of Buenoano, sent letters to a number of agencies requesting public records pursuant to chapter 119, Florida Statutes (1997). Three agencies, including the State Attorney for the Ninth Judicial Circuit, refused to provide the documents, maintaining that Buenoano had not complied with Florida Rule of Criminal Procedure 3.852. Buenoano's petitions seeking to require the three agencies to comply with her requests were treated as motions to compel under rule 3.852 and transferred to the trial court that would hear her rule 3.850 motion. After the Governor signed a third death warrant setting execution for March 30, 1998, the trial court denied the motions to compel.
The State Attorney for the Ninth Judicial Circuit subsequently filed a "Request for In Camera Inspection and Judicial Determination of Prosecutorial Obligation." The trial court granted the motion, and the State Attorney *945 submitted a set of documents that had not been disclosed to Buenoano. The documents had been sent to the State Attorney by the United States Department of Justice in December 1997, with a transmittal letter indicating that the documents should only be disclosed pursuant to a protective order and that the documents should be returned when they were no longer needed. The documents pertained to an investigation of the FBI Crime Laboratory conducted by the United States Department of Justice, Office of the Inspector General. The investigation also looked into the practices of Special Agent Roger Martz, who testified in Buenoano's Escambia County trial for the attempted first-degree murder of John Gentry and whose conclusions concerning the contents of the capsules Buenoano had given Gentry were part of the stipulation read to the Orange County jury. The documents were forwarded to the State Attorney after the following series of events.
In April 1997, the Office of the Inspector General (OIG) issued a report entitled "The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases." The OIG initiated the investigation, which resulted in the report, based on allegations made by Supervisory Agent Frederic Whitehurst. Whitehurst was a Ph.D. scientist who began working in the FBI laboratory in 1986, after Martz's examination of the Vicon C capsules. Among other things, the report brought into question some of the practices of Special Agent Roger Martz. Martz was an examiner in the Chemistry-Toxicology Unit of the FBI lab from 1980 to 1989, and in 1989, became the chief of that unit. The allegations regarding Martz resulted in the OIG concluding that:
Roger Martz lacks the credibility and judgment that are essential for a unit chief, particularly one who should be substantively evaluating a range of forensic disciplines. We found Martz lacking in credibility because, in matters we have discussed above, he failed to perform adequate analyses to support his conclusions and he did not accurately or persuasively describe his work. We recommend that Martz not hold a supervisory position. The Laboratory should evaluate whether he should continue to serve as an examiner or whether he would better serve the FBI in a position outside the Laboratory. If Martz continues to work as an examiner we suggest that he be supervised by a scientist qualified to review his work substantively and that he be counseled on the importance of testifying directly, clearly and objectively, on the role of protocols in the Laboratory's forensics work, and on the need for adequate case documentation. Finally, we recommend that another qualified examiner review any analytical work by Martz that is to be used as a basis for further testimony.
Although the report made reference to specific cases, Buenoano's cases were not discussed anywhere in the report.
After learning of the investigation into the FBI crime lab, CCRC, on behalf of Buenoano, requested information from the task force which had investigated the lab. The task force, which continued to investigate Martz's role in specific cases after release of the report, made inquiries of the prosecutors in Buenoano's Escambia and Orange County cases. During the inquiries, John Spencer, an Assistant State Attorney for the First Judicial Circuit, incorrectly advised the task force that Martz was not called as a witness in the Escambia County attempted first-degree murder trial.[2]
*946 The trial court reviewed the documents submitted by the State for in-camera inspection and found the State had no obligation, under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to provide the documents to Buenoano. The trial court denied a supplemental request for in-camera inspection in which the State Attorney attempted to submit additional documents inadvertently left out of the first set of documents inspected by the court. The State Attorney, apparently overlooking the terms of the Department of Justice transmittal letter, then voluntarily gave the documents that were the subject of the supplemental request to Buenoano and included them in Volume IV of the court record, without first seeking a protective order.
When Buenoano appealed the trial court's orders concerning the federal documents, the State Attorney sought an emergency protective order from this Court covering all the documents it had received from the Department of Justice, including those it had given Buenoano and made a part of the record. This Court issued two orders addressing the State's motion. In the first order, the Court directed that disclosure of the documents contained in Volume IV of the record be limited to Buenoano, her counsel, her investigators, and her experts until further order of the Court. Several days later, the Court issued an order directing that the sealed documents which were the subject of the State's first request for in-camera inspection be made available to Buenoano on the same conditions that had been placed on the documents already in her possession. Accordingly, the documents were given to Buenoano for her use, but were not subject to public disclosure. Under the Court's order, all the documents addressed in both orders would become open to the public if the State failed to file a motion for protective order in the trial court. The State sought a protective order covering a number of the documents received from the Department of Justice. After the trial court denied the State's motion, this Court reversed and remanded for entry of a protective order covering only ten documents. State v. Buenoano, 707 So.2d 714 (Fla.1998).
In addition to the orders regarding the State's motion for protective order, this Court issued an order specifically addressing Buenoano's appeal from the denial of her motions to compel. The February 6, 1998 order directed the three agencies that refused to comply with her public records requests to make available to CCRC all documents in their possession that were subject to a chapter 119 request and had not been provided to Buenoano, or to claim exemptions in the trial court. After release of that order, Buenoano then made additional public records requests to other agencies and filed with the trial court motions to compel when a number of those agencies failed to respond. Buenoano also filed motions to compel with regard to chapter 119 requests she made prior to this Court's February 6, 1998 order.
Buenoano subsequently filed with this Court a "Petition for Writ of Mandamus/Prohibition and to Invoke this Court's Extraordinary Jurisdiction to Issue All Writs Necessary to the Complete Exercise of Its Jurisdiction and Request for a Stay of Execution." The petition was filed after Buenoano discovered that the State Attorney's Office for the First Judicial Circuit had told the FBI lab task force that Martz did not testify in Buenoano's Escambia County trial. Buenoano alleged that because the State Attorney misinformed the task force, the task force never investigated Martz's conduct in her case. This Court issued an order transferring the petition to the trial court and directing the trial court to treat the petition and request for stay of execution as a motion for postconviction relief, subject to amendment.
In accordance with the trial court's March 3, 1998 order, Buenoano filed a motion for postconviction relief and request for stay of execution on March 4, 1998. Much of the postconviction motion centered around information concerning Roger Martz. However, Buenoano also sought relief based on outstanding state and federal public records requests and information concerning one of the jurors who served on her Orange County *947 jury. After holding a Huff[3] hearing on the motion, the trial court summarily denied relief.
With regard to Buenoano's claim that certain State agencies were withholding public records, the trial court refused to grant a stay or leave to amend, because Buenoano long ago could have obtained these records through the exercise of due diligence. However, the court continued to "assist" Buenoano in her efforts to obtain records from various agencies by ordering the agencies to provide the requested records or claim exemptions, and by ordering hearings on the claimed exemptions. In the various orders that followed those hearings, the trial court denied some of Buenoano's motions to compel and granted others. We addressed Buenoano's appeals from these orders in an order in Buenoano v. State, Nos. 92,553 & 92,596 (Fla. Mar. 24, 1998). We affirmed the majority of the trial court's rulings on the motions to compel but reversed several of the rulings and remanded with instructions for further proceedings. However, we emphasized that the additional proceedings "shall not serve as a basis for a stay of execution unless Buenoano makes a showing that the documents sought contain newly discovered evidence likely to entitle her to relief." Now we turn to Buenoano's appeal of the trial court's summary denial of her third rule 3.850 motion.

RULE 3.850 MOTION
In this appeal, Buenoano raises the following claims: (I) the trial court erred in denying a stay and requiring Buenoano to file an amended rule 3.850 motion before crucial public records were disclosed by state and federal government agencies and to litigate her claims while a protective order covering specific federal documents remained in effect; (II) the State withheld critical exculpatory evidence of guilt or presented false or misleading evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); (III) the trial court erred in summarily denying Buenoano's request that she be permitted leave to amend her rule 3.850 motion once she receives all information from the federal government regarding the investigation of the FBI crime lab; (IV) the trial court erred in denying Buenoano's claim that certain state agencies have withheld access to public records in violation of chapter 119, the Florida Constitution and the United States Constitution; (V) Buenoano's death sentence is based upon an unconstitutionally obtained prior conviction; and (VI) the trial court erred in denying relief based on Buenoano's claim that her right to a fair and impartial jury was violated when one of the Orange County jurors failed to disclose during jury selection that he had been convicted of involuntary manslaughter in another state.
First, we address Buenoano's contention that the trial court erred in summarily denying her third motion for postconviction relief. Buenoano maintains that, based on the information she has obtained as a result of the OIG investigation into the practices of Special Agent Roger Martz, she is entitled to an evidentiary hearing on the Brady, Giglio, and newly discovered evidence claims she raises in claim II. Summary denial of these claims was proper because, as explained below, the motion, record, and files conclusively demonstrate that these claims do not provide a basis for relief. Roberts v. State, 568 So.2d 1255, 1256 (Fla.1990) (upholding summary denial of rule 3.850 motion where the motion and record conclusively demonstrated that the defendant was not entitled to relief); Fla. R.Crim. P. 3.850(d); Fla. R.App. P. 9.140(i) (providing that unless the record shows conclusively that the appellant is entitled to no relief, appellate court must reverse order summarily denying postconviction relief and remand for evidentiary hearing).
Turning to the claims raised in claim II, we find that the Brady claim and the newly discovered evidence claim based on possible impeachment evidence contained in documents discovered as a result of the OIG investigation were properly raised in this successive motion for postconviction relief. The facts on which these claims are based *948 were unknown to Buenoano and her counsel and could not have been ascertained by the exercise of due diligence within the time limitations of rule 3.850, and the claims were filed within one year of learning of the OIG's report. See Mills v. State, 684 So.2d 801, 804-05 (Fla.1996); Fla. R.Crim. Pro. 3.850(b)(1) (providing for filing of motion for postconviction relief beyond time limitations of rule where facts underlying claim were unknown to movant or the movant's attorney and could not have been ascertained by the exercise of due diligence). However, the trial court properly found Buenoano's Giglio claim, which alleges that the state presented misleading and false testimony, procedurally barred. As to this claim, the trial court found:
Buenoano asserts that the newly discovered evidence regarding Roger Martz shows that the State presented "misleading, inaccurate, and perjured testimony," that "this newly discovered information further establishes that unreliable and inadmissible scientific evidence was presented by the State[,] and that the State's witness affirmatively misled defense counsel as to the results of the scientific testing."
As stated above, Roger Martz did not testify in this case. Therefore, the claim that the State presented "misleading, inaccurate, and perjured testimony" and that "this newly discovered information further establishes that unreliable and inadmissible scientific evidence was presented by the State and that the State's witness affirmatively misled defense counsel as to the results of the scientific testing" is baseless.
As previously stated, Buenoano willingly agreed to enter into evidence a statement that Roger Martz examined the pills in the Gentry case, and that he concluded that those pills contained paraformaldehyde. Buenoano has not alleged that she was in any way prohibited from testing the pills, and if she contested Martz's finding that the pills contained paraformaldehyde, she could have conducted her own examination of said pills back at the time when she was on trial in Escambia County for the attempted murder of John Gentry.
We agree that Buenoano's Giglio claim is both "baseless" and procedurally barred. It is baseless because none of the new evidence demonstrates that Martz's conclusion concerning the content of the capsules was inaccurate; at most, the evidence could have been used to impeach Martz or otherwise put his conclusions into question. The claim is barred because until as recently as 1992, when the capsules were destroyed, Buenoano could have had them examined to determine whether Martz's conclusions concerning their contents were "false" or "misleading."[4]
Turning to her Brady claim, Buenoano argues that the state withheld critical exculpatory evidence, in violation of United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and Brady. In order to be entitled to relief based on this claim, Buenoano must establish that: (1) the State possessed evidence favorable to her (including impeachment evidence); (2) she does not possess the evidence nor could she obtain it with any reasonable diligence; (3) the evidence was suppressed; and (4) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different. Mills, 684 So.2d at 805; Hegwood v. State, 575 So.2d 170 (Fla.1991). "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383; see also Gorham v. State, 597 So.2d 782, 785 (Fla.1992). As explained in Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995), a Brady violation is established by showing that the favorable evidence suppressed by the State "could reasonably be taken to put the whole case in such a different light as to undermine confidence *949 in the verdict." See Jones v. State, 709 So.2d 512 (Fla.1998).
The trial court properly concluded that no relief is warranted here, reasoning that even if Buenoano could establish that the State somehow suppressed favorable evidence concerning Martz's practices at the FBI lab,[5] "there is no reasonable probability that the result of the proceedings or sentence imposed would have been any different had the information regarding Martz been presented."
As explained above, Martz did not testify in the Orange County first-degree murder trial for which Buenoano faces execution. Martz's conclusion concerning the contents of the capsules which Buenoano gave John Gentry was merely mentioned in a stipulation which was read to the Orange County jury. The stipulation was read to the jury after John Gentry testified concerning Buenoano's attempts to poison him. The stipulation did not contain any evidence concerning the arsenic poisoning of James Goodyear or Bobby Joe Morris.
During the guilt phase of the Orange County trial, the jury heard evidence concerning only Buenoano's attempts to poison Gentry.[6] Gentry testified he and Buenoano had been engaged and had lived together and that Buenoano was the beneficiary on his life insurance policy and was a fifty percent beneficiary under his will. According to Gentry, Buenoano told him that her husband James Goodyear had died in a plane crash in Vietnam and that Bobby Joe Morris, with whom Buenoano had lived after Goodyear's death, had died of alcoholism. Gentry further testified that he had become violently ill after taking what he believed to be vitamin C capsules, Vicon C, which Buenoano had given him for a cold. Gentry became so ill he checked himself into a hospital. When Gentry recovered and returned home, he became ill again after Buenoano gave him more Vicon C capsules. When Gentry stopped taking the capsules, he immediately returned to good health. Buenoano thereafter suggested that Gentry take a double dose of the capsules, which he began saving and eventually turned over to the police.
The stipulation containing the reference to Roger Martz's conclusions concerning the capsules was introduced after Gentry's testimony. The stipulation reads in pertinent part:
It's been stipulated by the State and the defense that the pills that Mr. Gentry testified to were retrieved by ... the Pensacola Police Department, that those pills were taken into evidence by Officer Gwendolyn Pate, that she then in turn transmitted those pills to the Florida Department of Law Enforcement, where they were analyzed by a chemist by the name of Marion Estees.
Mr. Estees determined, one, that the container of the capsules were Vicon C type capsules, two, that Mr. Estees was unable to determine the contents of the capsules.
Those capsules were subsequently forwarded to the Federal Bureau of Investigation's laboratory in Washington, D.C., and examined by a chemist by the name of Roger Markz [sic] of the FBI. Mr. Markz [sic] determined that the capsules were Vicon C, and that the substance contained inside those capsules was paraformaldehyde, Class III poison.
It's been further stipulated by the State and the defense that search warrants were executed by the police, ... at the home owned business of the defendant in July of 1983, in Pensacola, Florida, that as a result of the execution of that search warrant of *950 her home there was no paraformaldehyde found there, nor any arsenic.
That as a result of the execution of the search warrant at her business, Fingers and Faces, there was no paraformaldehyde found there, nor was there any arsenic found there.
In denying Buenoano's Brady claim, the trial court reasoned that the evidence concerning Roger Martz "constitutes, at most, impeachment evidence in light of the fact that Buenoano does not have any basis to assert that the conclusions he reached regarding the Vicon C capsules were erroneous." As the trial court noted, Martz's examination of the Vicon C capsules is not addressed in any of the documents resulting from the OIG investigation into the FBI Lab.[7] In concluding that "there is no reasonable probability that the result of the proceedings would have been different had the evidence regarding Martz's problems at the FBI Laboratory been disclosed to the defense," the trial court relied on the following evidence which was presented at trial:
The State presented the testimony of Dr. R.C. Auchenbach and Dr. Leonard Bednarczyk, who both testified that they believed Mr. Goodyear's death was related to arsenic poisoning.
Additionally, the State presented the testimony of Ms. Constance Lang. Ms. Lang's testimony included statements that she and Buenoano became "as close as sisters" and that Buenoano would "joke" with her about how they could solve their problems with their husbands by poisoning them with arsenic.
The State also presented the testimony of Ms. Debra Sims. Ms. Sims testified that Buenoano hesitated to take Goodyear to the hospital after he exhibited signs of illness.
Further, the State presented the testimony of Ms. Mary Beverly Owens. Ms. Owens testified that Buenoano informed her that she could kill her husband with fly or some other type of insect poison and that there was "no way they could ever find out, because the autopsy won't show up unless they are really looking for that." Further, Ms. Owens testified that Buenoano confessed to her that she had killed James Goodyear with arsenic.
Moreover, the State presented the testimony of Lodell Morris. Mr. Morris also testified that Buenoano told him she had killed her husband, James Goodyear. Furthermore, Mr. Morris testified as to how his son, Bobby Joe Morris, who had been living with Buenoano, died after exhibiting symptoms which were similar to the symptoms which Mr. Goodyear suffered from before his death.
The State also presented testimony regarding the insurance policies that Buenoano had taken out on James Goodyear and Bobby Joe Morris. Additionally, the State presented evidence that the death of Bobby Joe Morris was also the result of acute arsenic poisoning.
Moreover, with regard to the penalty phase the trial court noted that in addition to presenting evidence of the Escambia County conviction for the attempted murder of John Gentry, the State presented evidence of Buenoano's Santa Rosa County first-degree murder conviction for the drowning death of her son. Considering all the evidence presented to the jury at both the guilt and penalty phases of the trial, we conclude the documents concerning Roger Martz's practices at the FBI lab cannot reasonably be taken to put the entire Orange County case in such a different light as to undermine confidence in the verdict or recommendation of death. Kyles, 514 U.S. at 435, 115 S.Ct. at 1566; Jones, 23 Fla. L. Weekly S137, 709 So.2d at 526.
The trial court found that just as Buenoano's Brady claim must fail, so too *951 must any newly discovered evidence claim based on documents concerning Roger Martz which were discovered as a result of the OIG investigation. The court reasoned that even if the information is considered newly discovered because it could not have been known by Buenoano or her counsel at the time of trial by the use of due diligence, it is not of such a nature that it would probably produce a different result on retrial. Jones v. State, 591 So.2d 911, 916 (Fla.1991). Relying on the record evidence outlined above, the court concluded that "either with impeachment evidence regarding Roger Martz, or without any reference whatsoever to the attempted murder of John Gentry, there was ample evidence to show beyond a reasonable doubt that Buenoano committed the murder of James Goodyear." And as noted above, there was another first-degree murder conviction to support the prior violent felony aggravator. We agree that on this record there is no reasonable probability that the new evidence would result in an acquittal or recommendation of life on retrial.[8]See Williamson v. Dugger, 651 So.2d 84, 89 (Fla. 1994) (recognizing that effect of newly discovered evidence may depend on whether evidence is merely impeaching), cert. denied, 516 U.S. 850, 116 S.Ct. 146, 133 L.Ed.2d 91 (1995).
Based on our resolution of the above claims, any relief, including a stay of execution, which Buenoano seeks in order to enable her to gather more information concerning Roger Martz and to further develop her claims for relief based on that information also was properly denied by the trial court.[9]See, e.g., Bowersox v. Williams, 517 U.S. 345, 116 S.Ct. 1312, 134 L.Ed.2d 494 (1996) (recognizing that stay of execution on second or third petition for postconviction relief is warranted only where there are substantial grounds upon which relief might be granted); Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) (same).
Relief also was properly denied in connection with Buenoano's claim that her death sentence is based on an unconstitutionally obtained prior convictionthe Escambia County conviction for the attempted murder of John Gentry by car bombingand, therefore, she is entitled to relief under Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). Buenoano raised a similar claim in her first motion for postconviction relief. Buenoano v. Dugger, 559 So.2d 1116, 1118 (Fla.1990). However, we did not reach the prior claim because, as Buenoano acknowledged, it was not ripe for review, presumably because she had not collaterally challenged her prior convictions. Id. at 1120. Although Buenoano maintained *952 before the trial court below that her Escambia County conviction will be overturned in light of the newly obtained evidence concerning Roger Martz, she did not file a postconviction motion challenging that conviction until March 20, 1998. The Escambia County trial court denied the motion March 26, 1998.
The fact that the denial of relief likely will be appealed does not entitle Buenoano to relief. See Eutzy v. State, 541 So.2d 1143, 1146 (Fla.1989) (recognizing that defendant seeking collateral review of a conviction which served as the sole evidence of a prior violent felony conviction is not entitled to relief under Johnson); Roberts v. State, 678 So.2d 1232, 1235 (Fla.1996) (same). Moreover, even if Buenoano's Escambia County conviction had been overturned, her Santa Rosa County conviction for the first-degree murder of her son is sufficient to support the prior violent felony aggravator. Additionally, there are three other valid aggravating factors, which in no way could be affected by information concerning Martz, and a complete absence of mitigating circumstances. See Stano v. State, 708 So.2d 271 (Fla.1998); Henderson v. Singletary, 617 So.2d 313, 316 (Fla.), cert. denied, 507 U.S. 1047, 113 S.Ct. 1891, 123 L.Ed.2d 507 (1993); Bundy v. State, 538 So.2d 445, 447 (Fla.1989).
Next, we turn to Buenoano's claim that she is entitled to a new trial, under this Court's decision in De La Rosa v. Zequeira, 659 So.2d 239 (Fla.1995), because a juror who served on her Orange County jury failed to disclose during voir dire examination by the prosecutor that he had been convicted of involuntary manslaughter in another state.
In denying Buenoano relief, the trial court concluded that the claim was procedurally barred because Buenoano failed to establish that the facts underlying the claim could not have been known by her or her counsel by the use of due diligence. Fla. R.Crim. Pro. 3.850(b)(1). The court reasoned that Buenoano has had over a decade to research and discover any alleged irregularities in the jurors' backgrounds and the fact that juror Battle had been convicted of a crime easily could have been discovered within the time limits of rule 3.850 through the exercise of due diligence. We agree.
Juror Battle responded affirmatively to the following question on his juror questionnaire: "HAVE YOU OR ANY MEMBER OF YOUR FAMILY EVER BEEN ACCUSED, COMPLAINANT, OR WITNESS IN A CRIMINAL CASE?" Relief was properly denied because the juror questionnaires were available to collateral counsel and, through the exercise of due diligence, the facts underlying this claim could have been discovered within the time limitations of rule 3.850.
Finally, we address Buenoano's claim that the trial court erred in refusing to grant a stay while she litigated her chapter 119 public records requests made to various state agencies. Specifically, she claims that her motions to compel should have been resolved prior to the Huff hearing or any decision on her rule 3.850 motion. Without the documents sought in her motions to compel, Buenoano maintains that she was unable to file a "complete" rule 3.850 motion. She asks this Court to remand for an evidentiary hearing on or responses to the motions to compel and thereafter to allow her to amend her rule 3.850 motion.
As the trial court recognized, this Court has extended the time period for filing a rule 3.850 motion so that capital postconviction defendants could amend initial rule 3.850 motions after all requested public records were furnished. See Ventura v. State, 673 So.2d 479 (Fla.1996); Walton v. Dugger, 634 So.2d 1059 (Fla.1993); Anderson v. State, 627 So.2d 1170 (Fla.1993); Muehleman v. Dugger, 623 So.2d 480 (Fla.1993); Provenzano v. Dugger, 561 So.2d 541 (Fla.1990). However, each of the cases in which the Court remanded to allow for an amended rule 3.850 motion involved an initial timely rule 3.850 motion. Here, we are presented with Buenoano's third motion for postconviction relief, clearly filed outside the time limitation of rule 3.850(b). As explained above, before Buenoano could be entitled to relief based on any claim she might raise as a result of her public records requests, in this otherwise procedurally barred motion, she must establish that the facts on which the claim is based were unknown to her or her attorney and could not have been ascertained by the use of due *953 diligence. See Fla. R.Crim. Pro. 3.850(b)(1); Mills.
The Public Records Act has been available to Buenoano since her conviction; but most of the records she alleges were not disclosed prior to the filing of her latest rule 3.850 motion were not requested until January 1998, or later. Some of the records were requested in January 1997, but Buenoano did not seek to compel compliance with those requests until February 1998. Buenoano has not alleged that through the exercise of due diligence she could not have made these requests within the time limits of rule 3.850. Accordingly, she is precluded from asserting that the trial court should have addressed her public records requests prior to denying her third rule 3.850 motion. Cf. Zeigler v. State, 632 So.2d 48 (Fla.1993) (finding that rule 3.850 bars as untimely a motion based on information obtained as a result of a chapter 119 public records request made after the cut-off date for postconviction relief), cert. denied, 513 U.S. 830, 115 S.Ct. 104, 130 L.Ed.2d 52 (1994); Agan v. State, 560 So.2d 222 (Fla.1990) (same); Demps v. State, 515 So.2d 196 (Fla.1987) (same).
Although we conclude that the trial court properly proceeded with Buenoano's rule 3.850 motion, we agree with the trial court that if Buenoano, in pursuing her public records requests, discovers information that amounts to newly discovered evidence under rule 3.850(b)(1), she may file another motion for postconviction relief based on that evidence. However, Buenoano has not alleged that any evidence she has received to date as a result of her requests qualifies as newly discovered or that she anticipates documents yet to be produced will contain evidence that she previously could not have obtained. Instead, Buenoano merely has alleged that numerous ruling by the trial court on her motions to compel were in error.[10] Buenoano's eleventh-hour public records requests and resulting litigation are insufficient to justify a stay of execution, particularly where she has not alleged that the requests will produce newly discovered evidence. Moreover, we will deny relief sought in further appeals regarding public records requests unless Buenoano establishes that she could not have timely sought production of the documents or that the documents were previously requested but unlawfully withheld.
Accordingly, we affirm the trial court's denial of Buenoano's motion for postconviction relief and request for stay of execution. No motion for rehearing will be heard.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, HARDING, WELLS and PARIENTE, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).
[2] According to Buenoano, she was not aware that the State Attorney had misinformed the task force about Martz until February 20, 1998, when she received 20 additional documents from the Department of Justice. She obtained the documents after filing a Freedom of Information Act (FOIA) lawsuit on January 23, 1998. The documents also show that the task force sent Spencer a copy of Martz's testimony in the Escambia County case and that Spencer responded in a letter dated February 19, 1998, admitting his error.

As a result of Buenoano's FOIA suit and a settlement reached in the case between the FBI and Agent Whitehurst, whose allegations initiated the investigation into the FBI lab, the Department of Justice is now in the process of releasing to Buenoano large amounts of additional documents regarding the investigation.
[3] Huff v. State, 622 So.2d 982 (Fla.1993).
[4] Likewise, any newly discovered evidence claim based on evidence that Buenoano alleges she obtained in a recent interview with Frederic Whitehurst, after the Huff hearing, is procedurally barred. Through the exercise of due diligence, collateral counsel could have had Martz's findings and reports reviewed by an expert within the time limitations of rule 3.850(b). The recently filed affidavits of several experts, including Whitehurst, addressing Martz's conclusions in no way affect our ruling here.
[5] Evidence that Buenoano alleges that she obtained in a recent interview with Frederic Whitehurst cannot be characterized as Brady material. Agent Whitehurst has no direct knowledge of the techniques Martz used to examine the Vicon C capsules because Whitehurst did not begin working at the FBI Lab until 1986. This was well after Martz examined the capsules and testified as to their contents in the 1984 Escambia County trial. Clearly, none of Whitehurst's recently obtained opinions about the techniques Martz used in reaching his conclusions concerning the capsules can be considered favorable evidence that was withheld by the State, under Brady.
[6] The jury did not hear evidence concerning Buenoano's attempted first-degree murder conviction based on the car bombing during the guilt phase. Evidence concerning that conviction was not introduced until the penalty phase.
[7] This includes the ten documents which were under temporary protective order at the time Buenoano was ordered to file her rule 3.850 motion. State v. Buenoano. While the trial court did not directly address the contents of the sealed documents, the trial court was aware of their content. We have reviewed the ten documents and determined that they make no reference to Buenoano's cases or to the techniques Martz used in examining the Vicon C capsules. Therefore, Buenoano's claim that the trial court erred by forcing her to litigate her rule 3.850 motion while the documents were under seal is without merit.
[8] To the extent Buenoano's motion can be read as raising ineffective assistance of trial counsel claims in connection with Martz's stipulated conclusions which were presented in the Orange County case, the trial court properly found these claims procedurally barred. Through the exercise of due diligence, Buenoano could have raised them in prior proceedings in which she raised ineffective assistance claims, and she cannot continue to raise such claims in a piecemeal fashion. Pope v. State, 702 So.2d 221 (Fla.1997); Jones v. State, 591 So.2d 911 (Fla.1991). If Buenoano had been concerned about counsel's decision to stipulate to Martz's conclusions or counsel's failure to seek a Frye v. United States, 293 F. 1013 (D.C.Cir.1923), inquiry regarding the conclusions, she could have had the capsules tested or Martz's results reviewed prior to the expiration of the time limitations in rule 3.850.

Even if we were to find that the ineffective assistance claims are not barred, no relief is warranted under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish a claim of ineffective assistance of counsel under Strickland a defendant must demonstrate that counsel's performance was deficient, and that there was a reasonable probability that but for the deficient performance, the outcome of the proceeding would have been different. The prejudice prong of the Strickland standard is the same as the standard for proving materiality of evidence favorable to the accused under Bagley. See Mills v. State, 684 So.2d 801, 805 n. 4 (Fla. 1996); Bagley, 473 U.S. at 682 [105 S.Ct. at 3383-84]. As noted above, Buenoano failed to meet this standard.
[9] In addition to arguing that it was error to deny her request for leave to amend after she receives and has had time to review the voluminous federal documents she has requested concerning the investigation into the FBI Crime Lab, Buenoano alleges it was error to force her to litigate her claims under a protective order. With regard to this claim, we have reviewed the ten documents under seal and have determined that, like the other documents concerning the investigation, the ten sealed documents do not address Martz's involvement in Buenoano's cases and, therefore, at most, provide impeachment evidence. See supra note 7.
[10] We affirmed the majority of those rulings in our order in Buenoano v. State, Nos. 92,553 and 92,596 (Fla. Mar. 24, 1998).